Franklin PHILLIPS, Petitioner,

v.

**INTERIOR BOARD OF MINE OPERATIONS APPEALS, Respondent,**

**Bituminous Coal Operators' Association and Kentucky Carbon Corporation, Intervenors.**

No. 73–1260.

United States Court of Appeals, District of Columbia Circuit.

June 20, 1974.

Rehearing Denied Aug. 26, 1974.

17. United States v. United Mine Workers, 330 U.S. at 304, 67 S.Ct. 677.

Joseph W. Justice, Pikeville, Ky., was on the brief for petitioner.

Irving Jaffe, Acting Asst. Atty. Gen., Harold H. Titus, Jr., U. S. Atty., at the time the brief was filed, Walter ·H. Fleischer, and Karen K. Siegel, Attys., Dept. of Justice, were on the brief for respondent.

Guy Farmer, Washington, D. C., was on the brief for intervenor, Bituminous

Coal Operators' Assn. Lynn D. Poole, Washington, D. C., entered an appearance for intervenor.

Robert G. Kelly and Charles Q. Gage, Charleston, W. Va., were on the brief for intervenor, Kentucky Carbon Corp.

Before HASTIE,* United States Senior Circuit Judge, and ROBB and WILKEY, Circuit Judges.

WILKEY, Circuit Judge:

In this case the court is called upon to determine whether the discharge of coal miner Phillips, petitioner, was violative of the Federal Coal Mine Health and Safety Act of 1969 [1] [hereinafter Safety Act]. We find that Phillips brought himself within the penumbra of the Safety Act by notifying his foreman of defective equipment creating dangerous working conditions. Such safety violations, followed by worker notification to management and an ensuing disagreement, are not to be equated with a simple labor dispute; safety violations bring section 110(b)(1) of the Safety Act [2] into operation. We reverse the decision of the Board and reinstate the decision of the Administrative Law Judge.

## I. THE DISCHARGE OF PETITIONER PHILLIPS

Franklin Phillips was employed for two years by the Kentucky Carbon Corporation [Kencar] at its Kencar No. 1 Mine in Phelps, Kentucky. During the last four months of his employment he worked as a shuttle car operator, i. e., he received coal from a mechanized loader, transported it to a belt conveyer, and there unloaded it into a Roscoe which fed the coal to the belt. On 28 April 1971 Phillips was discharged orally by his foreman because of his failure to comply with an order to return to work, despite his belief that the working conditions were dangerous. Two days later a written discharge slip from Kencar topside management was presented to Phillips.[3]

For several months prior to the discharge Phillips and other employees had raised complaints with their foreman, H. E. Edwards, concerning health and safety aspects of their work area.[4] Complaints centered on excessive coal dust and defective electrical wiring, serious problems of both health and safety underground. After the foreman failed to resolve satisfactorily these problems, complaints were taken to the members of the Mine Safety Committee. The Committee, which is provided for in the collective bargaining agreement, consists of elected representatives of the miners, who are authorized to investigate safety and health conditions and who may close an area of a mine if imminent danger to the men is threatened. The Committee was often able to insure that dangerous conditions were properly dealt with by the foreman, but several uncorrected conditions were reported to the Union District Safety Coordinator.[5]

In January 1971 a spot inspection of the mine was made by a federal safety inspector.[6] He required the shutting down of a section of the mine in which Phillips worked because of loose coal and coal dust, and improper splicing on electrical equipment.[7] Corrections of these

---

\* Sitting by designation pursuant to 28 U.S.C. § 294(d).

1. 83 Stat. 742, 30 U.S.C. § 801 et seq. (1970).

2. 30 U.S.C. § 820(b)(1).

3. The discharge slip stated that he was fired "For interfering with the operation of the mine and abridging the rights of management. Also refusing to obey a direct and proper order." Further, the slip said that "In addition you have received 3 disciplinary action slips since 1969—two for irregular work, and one for unsatisfactory work."

4. See Decision of Hearing Examiner (Administrative Law Judge) ¶ 8, in Appendix for Petitioner [hereinafter App.] at 15.

5. See ibid. The Union District Safety Coordinator has the duty of coordinating resolution of safety complaints between miners and mine operators, federal inspectors, and state inspectors.

6. The record does not indicate the impetus behind this particular inspection. See id. ¶ 10, in App. at 16.

7. Id. ¶ 9, in App. at 15–16.

safety violations were undertaken, and the mine was reopened on the same date. However, a Federal Bureau of Mines Notice of Violation charged Kencar with excessive respirable coal dust between 18 March and 1 April 1971.

Both before and after the federal orders Phillips personally lodged complaints concerning excessive coal dust and improper wiring with the foreman and with the Mine Safety Committee.[8] His reports to the foreman were found by the Administrative Law Judge below to anger the foreman, to the point of his throwing objects to the ground and declaring that Phillips was a troublemaker.[9]

One method of reducing coal dust used in the mine involved water sprays on the loader: water would be sprayed to wet down the coal and coal dust as the coal was poured into shuttle cars. The Administrative Law Judge found that while Phillips was employed as a shuttle car operator the sprays often were clogged and thus defective, requiring frequent cleaning.[10]

On the day of the discharge Phillips reported to the foreman that the water sprays were not operating properly. After indicating that he would investigate the matter, the foreman left that section of the mine. The men found that the dust became too thick while working, and the loader operator Ermil Justice asked Phillips to help him clean out the sprays. When the foreman returned, according to Phillips, this exchange occurred:

[T]he foreman come over while we were working on it and asked what was the matter. I told him we were trying to unstop the water and get water pressure on the loader. He said he was tired of that damned water situation and he was getting tired of it, he was going to put a stop to it one way or another. I said, "I worked in the dust a long time and I can't get nothing done about and I'm not going to work in it." He said, "If you don't want to work in it, I'll just take you outside." And I said, "No, I'll go on my own. You're not taking me anywhere. I'll go on my own." He said, "As far as I'm concerned, you're fired." And I said, "Suit yourself, I'll just go right on outside like you told me." [11]

Phillips then left the mine, and on 30 April a written discharge was received by him.[12]

This version of the events was accepted by the Administrative Law Judge as a correct account of what happened. It should be noted, however, that the foreman's testimony conflicted with Phillips'.[13]

---

8. *Id.* ¶¶ 15, 16, in App. at 17.

9. *Id.* ¶ 19, in App. at 19. We assume Phillips was a troublemaker for Kencar; the question is whether such troublemaking was justified legally.

10. *Id.* ¶¶ 19, 20, 21, in App. at 19.

11. Addendum to Brief of Respondent at 4a–5a [hereinafter Add.].

12. The opinion expressed by the NLRB Regional Director in a letter, relied on by our *dissenting colleague*, ". . . that there were no employees, other than Franklin Phillips, who had complained to their supervisor about the dust conditions in the mine on the date in question," is irrelevant and obscures the relevant facts. The shuttle car operator, Phillips, and the loader operator, Justice, were the two in position to know whether the spray was operating properly, before the other men would necessarily be

aware of the resulting increase in dust. The spray was *not* operating properly and it was the loader operator Justice who in this instance initiated the work stoppage to clean the spray.

Significantly, the loader operator Ermil Justice was not discharged, nor does he seem to have been disciplined for his participation in cleaning the water sprays. The obvious inference is that Phillips was singled out because of his previous safety complaints, none of which were shown to be unjustified.

13. The foreman's testimony was as follows:

When I went to the loader, I asked Ermil Justice, the loader operator, "What was the trouble," and he said Franklin Phillips said he didn't have enough water. So I told him to turn it on, to turn the water on and let me see it, to see how much water pressure he had.

■ It appears that Phillips then spoke with his Union, the United Mine Workers, for the Union filed a grievance under the National Bituminous Coal Wage Agreement of 1968 on 6 May 1971 with the Union-Corporation Joint Board of Arbitration. The Union charged that Phillips was wrongfully discharged "while helping the loader operator clean out water sprays on the loader to prevent a dust hazard at the request of the loader operator." [14] The Arbitration Board referred the matter to an umpire for final decision. On 29 June 1971 he determined that the Union grievance should be denied, since evidence established that Phillips had refused to haul coal when ordered to do so by the foreman, and the Union had not shown such hazards as would justify refusal. However, the umpire also stated that he had "no authority to interpret or enforce the regulations of the Federal Health and Safety Act," and declined to rule on Phillips' asserted rights under the Safety Act.[15]

Phillips then sought aid from the National Labor Relations Board in the form of a complaint against Kencar.

This was refused by the Regional Director on 17 December 1971 on the ground that arbitration was required before "striking," unless there were abnormal working conditions, which were not in fact present in this case.[16]

Up to this point, Phillips' efforts through both his Union and the NLRB had been unavailing, and it is important to note why. The Union Grievance Arbitration Board umpire declined to rule on Phillips' rights under the Safety Act, which are the rights now involved here. The NLRB Regional Director appeared to be completely confused as to what rights Phillips was asserting, the Director's rationale referring strangely to a collective bargaining agreement with a "no strike clause," that Phillips "could not legally go on strike," and that he "was obligated to arbitrate his grievance." This rather ignored the obvious fact that far from trying to go on strike, all Phillips wanted was his job back, and that he had tried arbitration, with the result that the umpire declined to rule on the one statute which could help him.

---

I asked Franklin Phillips, I saw the water was good water and I asked Franklin Phillips to get on his buggy and he told me he wasn't going to haul no coal.

Q: Did he give a reason?

A: Not the first time, I don't think he did. And I asked him again. I told him, "Get on your buggy and haul coal," and he didn't give me a reason then. So I asked him a third time and he said he wasn't going to haul no coal and that's when I fired him for refusing.

Q: Did you determine at that time whether these men had poor water pressure before they took the sprays off?

A: No. I observed the water earlier in the shift and it was good water.

Add. at 17a–18a.

14. *See* App. at 22.

15. *Ibid.* The arbitration agreement and proceeding do not preclude the court from taking jurisdiction of the Mine Safety Act question. The recent Supreme Court decision in Gateway Coal Co. v. United Mine Workers, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974), is not to the contrary. Phillips had begun the mine safety complaint process by notifying his foreman of the possibility of a

dangerous condition, and was then fired by the foreman. This is very different from the situation in *Gateway Coal*, where the union struck to protest the alleged safety hazard created by retention of foremen who had falsified safety records. Furthermore, the arbitrator here specifically denied that he had authority to consider the Safety Act. Thus, if the court does not interpret and enforce the Act, the Act will lose any effectiveness whatever.

Our interpretation of the relationship between arbitration and the Mine Safety Act is quite similar to the Supreme Court's analysis in an employment discrimination case, Alexander v. Gardner-Denver Co., 415 U.S. 36, 94 S.Ct. 1011, 39 L.Ed.2d 147, (1974). There Justice Powell, writing for a unanimous Court, held that an employee's right to a trial de novo under Title VII of the Civil Rights Act of 1964 (concerning his discriminatory discharge) was not precluded by previous submission of the grievance to final arbitration under the collective bargaining agreement.

16. *See* Brief of Intervenor, Bituminous Coal Operators' Association, at 4. No appeal was taken from the Regional Director's decision.

What this adds up to for us, as at this point it apparently did for Phillips, is that if there is no right of action under the Mine Safety Act independent of the usual labor dispute settlement mechanisms, there is no right of action under the Mine Safety Act at all. So, after this legal education at some cost in time and money, Phillips applied to the Secretary of Interior for review of his discharge under the Safety Act. After a hearing the Administrative Law Judge ruled on 8 June 1972 that the discharge violated section 110(b)(1) of the Coal Mine Health and Safety Act.[17] The Administrative Law Judge found that the mine foreman had reasonable grounds to know that Phillips had made repeated complaints both to the foreman himself and the Mine Safety Committee regarding electrical and coal dust violations. The ALJ credited Phillips' testimony as being more reliable than the foreman's; in particular he found that the foreman did not check the water sprays before discharging Phillips.[18]

From the evidence as a whole, the ALJ concluded that the discharge of Phillips was

arbitrary and discriminatory against [Phillips] because of his activities in complaining to the foreman and the Mine Safety Committee about safety and health conditions and because of [Phillips'] safety activities in assisting other miners in corrective maintenance to prevent exposure to excessive and hazardous coal dust.[19]

And he further concluded

that the motivating factor in the discharge of [Phillips] was an intent to penalize him for such safety complaints and safety activities, and to set an example for other employees not to complain of safety and health conditions or interrupt production by making necessary safety adjustments and repairs.[20]

On appeal the Interior Board of Mine Operations Appeals reversed the Administrative Law Judge. The Board recognized that Phillips had lodged complaints with the foreman and the Mine Safety Committee prior to his discharge. However, it also noted that Phillips did not seek any immediate redress upon being fired by the foreman.

The Board found no substantial evidence to support the Administrative Law Judge's findings of a discriminatory discharge.[21] Instead, the Board found that the reason for the discharge was the "refusal of Phillips to obey the direct order of the foreman to haul coal." [22]

Furthermore, the Board found the Administrative Law Judge's construction of the scope of section 110(b)(1) to be erroneous. According to the Board, a discharge motivated by complaints to the Mine Safety Committee would not make a *prima facie* case under the Safety Act, because the scope of protection of the Act is narrow. Complaints must be made to the Secretary or his authorized representative, not to fellow employees, supervisors, or the management of the mine.[23] Since the Board found

17. 30 U.S.C. § 820(b)(1) mandates that
 No person shall discharge or in any other way discriminate against or cause to be discharged or discriminated against any miner or any authorized representative of miners by reason of the fact that such miner or representative (A) has notified the Secretary or his authorized representative of any alleged violation or danger, (B) has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or (C) has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.

18. Decision of Administrative Law Judge, in App. at 24 n. 4.

19. *Id.* ¶ 33, in App. at 21.

20. *Id.* ¶ 34, in App. at 22.

21. The Administrative Law Judge's findings are quoted in text at notes 19, 20 *supra.*

22. Decision of Board, in App. at 37.

23. *Id.* at 39. This has been the position of the Board in another case which is presently before this court, Munsey v. Morton, No. 72–2095.

nothing in the record to show that Phillips had initiated or intended to initiate a report to the Secretary or his authorized representative, Phillips had not succeeded in bringing himself within the protection of the Safety Act.

## II. THE PROPER SCOPE OF THE MINE SAFETY ACT

### A. Cause of Discharge Sufficient to Invoke the Act

■ The resolution of the issue here depends on the coverage of and the procedure under the Mine Safety Act. Obviously the Board and the Administrative Law Judge differed in their interpretations. Specifically, we must determine whether a miner brings himself under the coverage of the Act by reporting safety violations to his foreman and Mine Safety Committee, or whether he must formally notify the Secretary of Interior or his authorized representative before he is protected. We believe that the answer is clear: given the mine's procedures regarding safety complaints, the coverage of the Act begins when the miner notifies his foreman and/or safety committeeman of possible safety violations.

■ It is important to recognize at the outset that this case arises out of the enforcement of the Mine Safety Act, not an ordinary labor dispute. While a simple employee discharge may be merely a labor dispute, when allegations of safety violations are not frivolous the court must carefully review the case to determine whether the Mine Safety Act has been obeyed. Our review indicates that the Act *is* involved here, and indeed we conclude that Phillips has presented a valid cause of action.

■ Safety costs money. The temptation to minimize compliance with safety regulations and thus shave costs is al-

ways present.[24] The miners are both the most interested in health and safety protection, and in the best position to observe the compliance or noncompliance with safety laws. Sporadic federal inspections can never be frequent or thorough enough to insure compliance. Miners who insist on health and safety rules being followed, even at the cost of slowing down production, are not likely to be popular with mine foreman or mine top management. Only if the miners are given a realistically effective channel of communication re health and safety, and protection from reprisal after making complaints, can the Mine Safety Act be effectively enforced.

There is no question but that Phillips felt there was a danger due to excessive coal dust on 28 April 1971. The previous actions of the federal inspectors and the Mine Safety Committee confirm that Phillips was not overly or unreasonably worried about the dangerous conditions in the mine.[25] When Phillips felt that the dust conditions were harmful, he did what he could to reduce the risk —he began to clean the water sprays. It was at this point that the foreman told him to start work, as opposed to continuing to fix the safety equipment. After rejecting Phillips' contention that it was necessary to reduce the dust, the foreman told him either to start work or be fired. Thus Phillips was given the choice of either working in what he felt was an unhealthy, unsafe area, or being discharged for not accepting the foreman's evaluation of the danger. His discharge on 28 April was the direct result of his disagreement with the foreman on the safety of the coal dust level.

We digress here to point out that the "substantial evidence" question is no question at all. Our dissenting colleague adequately describes the Administrative Law Judge's and Board's con-

24. Responsible mine operators who comply with health and safety standards have an obvious interest in seeing uniform standards enforced throughout the industry: competitors who get away with cutting costs by cutting safety are really engaged in unfair com-

petition; the temptation to meet it by engaging in similar tactics is ever-present.

25. In the latest of the series, excessive coal dust had been officially found within one month of Phillips' discharge. *See* pp. 774, 775 *supra*.

clusions on this: "First, the Board found there was no substantial evidence to support the finding of the Trial Examiner that Phillips was discharged because of his safety complaints and safety activities. After reviewing the evidence the Board found, contrary to the Examiner's conclusion, that the reason for the discharge was the refusal of Phillips to obey the direct order of his foreman to haul coal." (P. 787) Of course, both the Administrative Law Judge and the Board were right: Phillips was discharged because of his refusal to obey a direct order to haul coal because in his judgment the working conditions were unsafe and unhealthy and Phillips and his co-worker were engaged in an effort to repair the safety equipment (spray) before resuming hauling coal. The Board never considered any evidence different from the Administrative Law Judge's evidence; the Board simply summed up the evidence in a conclusory way designed to characterize the issue as an ordinary labor dispute—to which ordinary labor dispute remedies would attach. To the court it seems inescapable that the whole dispute arises under the Mine Safety Act and is governed by it; if there had been no Mine Safety Act, it seems likely that Phillips would never have registered this—and previous—safety complaints.

 The Mine Safety Act protects miners who are discharged as a result of their complaints concerning safety violations in mines. Section 110(b)(1) prohibits discharge of or discrimination against a miner by reason of the fact that the miner

(A) has notified the Secretary or his authorized representative of any alleged violation or danger,

(B) has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or

(C) has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.[26]

We believe that Phillips' notification to the foreman of possible dangers is an essential preliminary stage in both the notification to the Secretary (A) and the institution of proceedings (B), and consequently brings the protection of the Safety Act into play.

B. *Procedure*

 In so holding, we do not adopt either extreme urged upon us. We do not think that merely because a discharge originates in a disagreement between a foreman and a miner that the Mine Safety Act is automatically brought into play. Nor do we adopt the other extreme, take the bare words of the statute with their most limited interpretation, and hold that before a miner's safety complaint is accorded the protection of the Safety Act the coal miner must have instituted a formal proceeding with the Secretary of Interior or his representative. Rather, we look to: the overall remedial purpose of the statute (discussed under C. *infra*); the practicalities of the situation in which government, management, and miner operate; and particularly to the procedure implementing the statute actually in effect at the Kencar mine. The existence of this procedure in itself was a practical recognition that the bare words of the Safety Act, unless implemented by some procedure at the mine to bridge the gap between "the Secretary or his representative" (presumably the Federal Bureau of Mines) and the coal miner himself (the object of the Act), would be completely ineffective in achieving mine safety.

In summary, the procedure at the Kencar mine for the processing of safety complaints was the following:

(1) miner notifies his foreman of the problem and tries to obtain corrective action;

(2) if the foreman disagrees, the miner has the right to call in the Mine Safety Committeeman to evaluate the complaint;

26. 30 U.S.C. § 820(b)(1).

(3) (a) if the Mine Safety Committeeman agrees with the miner and the foreman fails to correct the problem the Committeeman can bring the case to the entire Committee and they may order the mine section closed;

(3) (b) if the Mine Safety Committeeman disagrees with the miner, the latter can request a Federal Mine Inspector be called in. Pending that determination, the miner is to be temporarily reassigned to another area.[27]

This finding of the Administrative Law Judge is not disputed, and could hardly be disputed, as it rests on testimony at the hearing of Kencar management that this procedure was in effect before and on the day Phillips was discharged.

The Administrative Law Judge further found:

It is conceded by Respondent that, *pending a resolution of a safety or health complaint, a miner* at the Kencar Mine *had the right to refuse to work* under conditions which he believed in good faith to be hazardous to his *safety or health.*[28]

Nothing in the Mine Safety Act or mine procedure suggests that the company has a right to fire a miner for refusing to work in a particular area of a mine when he fears a chronic, long-term threat to his health or safety there due to safety violations.[29]

The Administrative Law Judge further specifically found:

Pending a determination by the Federal Inspector, the miner was to be reassigned to other, temporary duties. No case experienced in this mine actually reached the stage of temporary reassignment pending a Federal inspection, but management acknowledged at the hearing that under its practices and the implementation of its bargaining agreement, such would be the rights of the miners regarding safety or health complaints.

7. It is evident that, although the above safety complaint rights were acknowledged by management at the hearing, they were not entirely understood by the miners themselves.[30]

It is clear beyond peradventure that Phillips was not required to accept the foreman's evaluation of danger; it is equally clear that he was discharged for not accepting the foreman's safety determination. We reject the Board's suggestion that Phillips was discharged only for a simple refusal to work. Rather, we conclude that the effective cause of Phillips' discharge was his complaint about hazardous working conditions in the mine.

▆▆ When the foreman told him he was fired, Phillips left the mine. He was undoubtedly unfamiliar with the elaborate appeal and review procedure; he assumed that the firing was final. In view of the discharge on improper grounds,[31] we cannot hold Phillips to the

---

27. *See* Decision of Administrative Law Judge ¶ 6, in App. at 14.

28. *Ibid.* Emphasis supplied. The actual practice of the mine followed steps (1) and (2) of the theoretical model, but it varied thereafter. If the Mine Safety Committeeman could not get the foreman to take appropriate action, he would either call in a federal inspector or transmit the complaint to the Union District Safety Coordinator, who might later call in a federal inspector. *Id.* ¶ 7, in App. at 14–15. Several times in the months before Phillips' discharge the Union District Safety Coordinator was required to step in and request modifications for safety; the spot federal inspection also unearthed safety defects.

29. The collective bargaining agreement is inapposite because the umpire here explicitly refused to consider the Mine Safety Act and its coverage of safety threats of a non-immediate nature. *See* p. 776 *supra.* And, there had been not only coal dust but defective wiring violations recently found in this mine (*see* p. 774 *supra*); excessive dust plus defective wiring is an explosive safety hazard; we cannot assume that Phillips' complaint went *only* to a long-term health hazard.

30. Decision of Administrative Law Judge ¶ 6, in App. at 14.

31. The discharge slip was quoted in note 3 *supra.* The Administrative Law Judge found that the three disciplinary action slips "were not pressed or proved by the Respondent at the hearing. On the con-

standard of requiring him to file a petition with the Mine Safety Committee, or to notify formally the Secretary or other authorized person. Phillips "instituted [a] proceeding" with the closest representative of any authority, i. e., his foreman, by making an effective complaint of a violation of the Mine Safety Act, i. e., refusing to work in unsafe conditions, for which he was promptly fired. While there is a possibility that the foreman also was unaware of the proper safety complaint procedures, nevertheless the mine management should have known of these procedures and rights, and with a greater time for reflection and investigation should have notified the miner of his rights of appeal and quashed the discharge. In fact the management did neither, but sent a formal discharge notice asserting additional grounds, the validity of which the foreman later denied. This ratification by Kencar management of the improper discharge, especially in view of previous safety complaints, violated the Mine Safety Act.

The above discussion of the procedures necessary to implement the Mine Safety Act makes clear our most fundamental disagreement with the decision rationale of the Board, espoused by our dissenting colleague here. The method of "institut[ing] any proceeding" or "notif[ying] the Secretary or his authorized representative" is not spelled out in the Act, certainly not in terms cognizable by a coal miner. The Kencar Mine management and union representatives sensibly recognized this, and put into effect a procedure to bridge the gap between the miner in the pit and the Federal Bureau of Mines, the Secretary's representative. That procedure had as its first step the miner notifying his foreman of the problem and trying to obtain corrective action. Phillips did precisely this in accordance with Kencar Mine's approved procedure to meet the standards of the Mine Safety Act. Phillips was fired for doing so.

To hold that Phillips was not protected against discharge because he took the first prescribed step under the Kencar procedure to invoke the Mine Safety Act, to hold that only a miner's *discharge after* he reaches the Bureau of Mines with his complaint is protected by the Safety Act, would nullify not only the protection against discharge but also the fundamental purpose of the Act to compel safety in the mines.[32]

We believe that the Mine Safety Act, to be effective, must be construed as we have here. If it is not, it will be easy for management to avoid the prohibitions of the Act. If every miner who complained of safety device failures could be placed in Phillips' situation, the Act would be a hollow promise of protection; a foreman's determination of safety would become final.

C. *Legislative History and Judicial Construction*

Our view of the Mine Safety Act is supported by the legislative history. Senator Kennedy, in introducing his amendment which became section 110(b)

---

trary, the foreman testified that [Phillips] had been a very good worker—as good as 'any miner in the section.' . . . I find from the evidence as a whole that the above added charges had no bearing upon the foreman's decision to discharge." Decision of Administrative Law Judge ¶ 26, in App. at 20–21.

32. *See* text at n. 24 *supra*. While previously Phillips had filed safety complaints as an *employee*, after his discharge he apparently assumed this channel was no longer open to him. Of course, to endorse this limited concept of the Safety Act's scope would be to put a premium on the company firing first, before the employee has a chance to institute a proceeding with the Secretary's representative. To hold that *only* a discharge after a formal proceeding has been instituted is protected, but that a discharge after the miner has taken the first step in the complaint procedure by complaining to his foreman is *not* protected, would be to invite all employers to gut the Safety Act by quick discharges of complaining employees. Yet this is where the Board's view, endorsed by the dissent here, would inexorably lead us.

of the Safety Act, noted the broad purpose of the provision:

> the rationale for this amendment is clear. For safety's sake, we want to encourage the reporting of suspected violations of health and safety regulations. . . .
>
> But miners will not speak up if they fear retaliation. This amendment should deter such retaliation, and, therefore, encourage miners to bring dangers and suspected violations to public attention.[33]

Senator Kennedy also remarked that

> [i]t is especially important that miners not feel inhibited to point out health and safety violations because there is such a high degree of danger in the mines.[34]

Given this wide scope of protection intended, a liberal construction of the language of the Act is justified.[35]

The House Committee on Education and Labor in reporting on the Act also suggested a liberal construction:

> Subsection (b) prohibits discrimination against miners for having exercised their rights under this Act or for having participated, *in any way*, in the enforcement of the Act. The subsection provides procedures for obtaining reinstatement and back pay for miners discharged by operators and other remedies for miners discriminated against.[36]

Furthermore, we note that the Third Circuit in considering a previous Mine Safety Act stressed a broad reading:

> [I]n construing safety or remedial legislation narrow or limited construction is to be eschewed. Rather, in this field liberal construction in light

of the prime purpose of the legislation is to be employed. This statute is remedial, with a humane purpose in view and is therefore entitled to a liberal construction.[37]

The parallels between the Mine Safety Act and other protective labor acts are significant. The Safety Act provision which we here construe was introduced with the announced intention of giving to miners "the same protection against retaliation which we give employees under other Federal labor laws."[38] Specifically, the National Labor Relations Act, the Fair Labor Standards Act, and the Landrum-Griffin Act were all noted as protecting employees against discrimination because of exercise of rights under the Acts.

The Supreme Court has construed the corresponding NLRA provision broadly: in NLRB v. Scrivener, dba AA Electric Company,[39] the Court held violative of the NLRA the discharge of an employee for his giving a sworn written statement to a NLRB field examiner who was investigating an unfair labor practice charge. Justice Blackmun, writing for the unanimous Court, was concerned that the employee should be protected in the investigative stages as well as after filing of formal charges or in giving formal testimony. Such protection is necessary " 'to prevent the Board's channels of information from being dried up by employer intimidation of prospective complainants and witnesses.' "[40] Furthermore, Justice Blackmun stated that

> the presence of the preceding words "to discharge or otherwise discriminate" reveals, we think, particularly by the word "otherwise," an intent on the part of Congress to afford broad

33. 115 Cong.Rec. 27948 (1969).

34. *Ibid.*

35. Thus we suggest it would be improper narrowly to construe Senator Kennedy's comment that his amendment would prohibit discrimination against miners for bringing violations "to the attention of authorities." *Ibid.*

36. House Comm. on Education and Labor, 91st Cong., 2d Sess., Legislative History,

Federal Coal Mine Health and Safety Act 1122 (1970) (emphasis added).

37. St. Marys Sewer Pipe Co. v. Director of U.S. Bureau of Mines, 262 F.2d 378 (3rd Cir. 1959) (citations omitted).

38. 115 Cong.Rec. 27948 (1969).

39. 405 U.S. 117, 92 S.Ct. 798, 31 L.Ed.2d 79 (1972).

40. *Id.* at 122 *quoting* John Hancock Mut. Life Ins. Co. v. NLRB, 89 U.S.App.D.C. 261, 263, 191 F.2d 483, 485 (1951).

rather than narrow protection to the employee.[41]

In the Mine Safety Act the words "in any other way discriminate" may be similarly construed.

█ We believe our view of the scope of section 110(b)(1) of the Mine Safety Act is the only practical one to ensure the health and safety of miners, which is the central purpose of the Act. Holding that miners are not protected until they initiate formal procedure for review, of which they may be unaware, would violate the goal of protecting the miners' health and would thus violate the Congressional intent.[42] The result we reach in this case best comports with the remedial purpose of the legislation. Therefore, we reverse the decision of the Interior Board of Mine Operations Appeals and reinstate the decision and order of the Administrative Law Judge.

So ordered.

ROBB, Circuit Judge, dissenting:

I dissent on two counts: (1) in my judgment the majority has misconstrued section 110(b)(1) of the Act; and (2) assuming that the majority rightly construes the Act, it is wrong in overturning the findings of the Board on the facts.

## I.

The petitioner Phillips was a shuttle car operator at a coal mine, his duty being to transport coal in his shuttle car from a mechanized loader at the face of the mine to a conveyor belt. The loader was equipped with water sprays to wet down the coal and reduce dust. While on duty Phillips refused to continue his work because in his opinion the water sprays on the loader were not working properly. The foreman disagreed with the petitioner's opinion and directed him

to resume work. When Phillips refused to obey the foreman discharged him.

Pursuant to the contract between the petitioner's Union, the United Mine Workers, and the company, the matter of the petitioner's discharge was submitted to binding arbitration. The grievance submitted by the Union on behalf of the petitioner alleged that he had been wrongfully discharged. After hearing testimony from both company and Union witnesses the umpire rendered his final and binding decision. He held, in pertinent part:

Under the Management of Mines clause of the contract the management of the mine, the direction of the working force, is vested exclusively in the operator. The only justifiable reason a miner would have to refuse to obey a direct order to continue to perform his normal duties, is that such an order would put him in danger of immediate personal injury or danger to his life. Such danger did not exist in this case.

The grievant in this case was not working continuously near the face of the coal where he complained of excessive dust. The only time he was there was when he was waiting to have his buggy loaded or his buggy was actually being loaded. The men who were working on the equipment at the face of the coal were there continuously during their shift. They continued on with their work and did not walk off the job. There is no showing in this case that the grievant was in any immediate danger of great physical harm or danger to his life by continuing to carry out his duties as the other employees of this section continued to do.

It has in all cases known to this umpire been held that failure to carry

41. 405 U.S. at 122, 92 S.Ct. at 801.

42. In stating the purpose and goals of the Act, the Congress declared that "the first priority and concern of all in the coal mining industry must be the health and safety of its most precious resource—the miner; . . .

there is an urgent need to provide more effective means and measures for improving the working conditions and practices in the Nation's coal mines in order to prevent death and serious physical harm, and in order to prevent occupational diseases originating in such mines." 30 U.S.C. § 801(a), (c).

out an order to perform duties assigned to a miner is a violation of the Management of Mines provision of the contract. If each miner can decide under what conditions he would work then the Management of Mine clause of the contract would have no meaning and management would have no control of the operation of the mines and the result would be chaos.

\* \* \* \* \* \*

In this case the grievant admits that he refused to work and obey a direct order of management to perform his duties and there is no showing he was in immediate danger of serious injury or loss of life. As unpleasant as it is the umpire must find that the management had the right under such circumstances to discharge the employee.

Phillips then complained to the National Labor Relations Board that his discharge was discriminatory. On December 17, 1971 the Regional Director refused to issue a complaint against the company. The Regional Director wrote:

The investigation has disclosed that there were no employees, other than Franklin Phillips, who had complained to their supervisor about the dust conditions in the mine on the date in question. Furthermore, the then current collective bargaining agreement contained an implied no-strike clause provision in the clause which provided for arbitration disputes. Therefore, under these circumstances it was deemed appropriate that Phillips was obligated to arbitrate his grievance and could not legally go on strike, unless there were abnormal working conditions in the mine on the date in question. Moreover, it has been concluded that the instant factual situation does not satisfy the requirements of "abnormal working conditions" as defined by the Board in Red Wing Carriers, Inc., 130 NLRB 1208.

Phillips next instituted the proceeding which is now before us under section 110(b)(2) of the Federal Coal Mine Health and Safety Act of 1969. (30 U. S.C. § 820(b)(2).) Seeking reinstate-ment, back pay and other damages he contended that his discharge was in violation of section 110(b)(1) of the Act which provides:

(b)(1) No person shall discharge or in any other way discriminate against or cause to be discharged or discriminated against any miner or any authorized representative of miners by reason of the fact that such miner or representative (A) has notified the Secretary or his authorized representative of any alleged violation or danger, (B) has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or (C) has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.

After a hearing the Trial Examiner (now called Administrative Law Judge) concluded that the company had violated section 110(b)(1) "by discharging the Applicant . . . because he had notified his Mine Safety Committee of alleged safety violations and dangers in the No. 1 Section of Respondent's mine." The examiner ordered the company to reinstate Phillips, with back pay and the costs and expenses of the proceeding, including attorneys' fees.

The Board of Mine Operations Appeals reversed the Hearing Examiner, holding that there was no substantial evidence in the record to justify the Examiner's conclusion. On the contrary, the Board found the preponderance of the evidence established that the reason for the discharge was

the refusal of Phillips to obey the direct order of the foreman to haul coal. Although the foreman's action may be looked upon as harsh or extreme, it is not within the province of the Judge or this Board to find that he had no authority to discharge any miner who disobeyed an order to work or otherwise acted in an unreasonable manner. We note that the umpire in the arbitration proceeding concluded, "As unpleasant as it is, the umpire must find that *the management had the right under such circumstances* to discharge

the employee" . . . (Ex. 4(c), p. II). We are concerned here only with the question of whether the discharge was in violation of section 110(b)(1)(A) of the Act. The principal objective of that section is to preserve the integrity of the Act and not to provide a new forum for the litigation of management and labor grievances. [Emphasis supplied by the Board.]

## II.

The majority concludes "that Phillips' notification to the foreman of possible dangers is an essential preliminary stage in both the notification to the Secretary . . . and the institution of proceedings . . ., and consequently brings the protection of the Safety Act into play." In other words the majority says that when Phillips complained to his foreman he "notified the Secretary or his authorized representative" of the alleged violation or danger, within the meaning of section 110(b)(1) of the Act. I cannot accept this construction of the statute.

In the first place it seems to me that the phrase "the Secretary or his authorized representative" on its face plainly does not mean a foreman or the mine employees serving on a safety committee. If Congress had intended the phrase to have such an inclusive meaning, so that any complaint by a miner concerning safety clothed him with the protection of section 110(b)(1), I think Congress would have said so. If the majority opinion were presented to a congressional committee considering amendments to the Act it might persuade the committee that section 110(b)(1) should be broadened to cover all safety complaints no matter to whom they are made; but this court is not a legislative committee.

My conclusion is reinforced when section 110(b)(1) is considered in the context of other sections of the Act. Thus the phrase "the Secretary or his authorized representative" appears elsewhere in the statute; it is not an isolated phrase used only in section 110(b)(1).

Section 103(a), 30 U.S.C. § 813(a), requires that "Authorized representatives of the Secretary shall make frequent inspections and investigations in coal mines . . . ." Section 103(b)(1) gives the Secretary "or any authorized representative of the Secretary" a right of entry to any coal mine for the purpose of inspection or investigation. Section 103(e) provides that in the event of an accident in a coal mine where rescue and recovery work is necessary "the Secretary or an authorized representative of the Secretary shall take whatever action he deems appropriate to protect the life of any person, and he may, if he deems it appropriate, supervise and direct the rescue and recovery activity in such mine." Section 103(f) empowers "an authorized representative of the Secretary" to issue safety orders in the event of any accident occurring in a coal mine. Section 103(g) provides: "Whenever a representative of the miners has reasonable grounds to believe that a violation of a mandatory health or safety standard exists, or an imminent danger exists, such representative shall have a right to obtain an immediate inspection by giving notice to the Secretary or his authorized representative of such violation or danger." Section 103(h) directs that at the commencement of any inspection of a coal mine "by an authorized representative of the Secretary, the authorized representative of the miners at the mine at the time of such inspection shall be given an opportunity to accompany the authorized representative of the Secretary on such inspection." Section 104, 30 U.S.C. § 814, deals in detail with the findings to be made and the actions to be taken by "an authorized representative of the Secretary", with respect to dangers or violations of health or safety standards discovered upon an inspection of a coal mine.

From these numerous references to "authorized representative of the Secretary" in the statute it seems plain to me that when Congress used those words in section 110(b)(1) it meant a mine inspector or some other designated agent of the Secretary, and not some commit-

tee or other representative of the miners. I think the purpose of section 110(b)(1) is to protect the integrity of the agency's investigative procedure by assuring that a miner who complained to the agency would not be penalized. To hold that the section applies to a miner who had never complained to the agency is I think to distort the statute.

My reading of the Act is confirmed by Senator Kennedy's comments on the floor of the Senate at the time he offered the amendment which ultimately became section 110(b)(1)–(3). The Senator offered his amendment as an addition or amendment to section 301(h) of the Senate bill. Section 301(h) of the Senate bill became section 103(g) of the statute as enacted. (See p. 785 supra.) The Kennedy amendment was added to the Senate bill as section 301(h)(2). The Senator said: "My proposed amendment would make it unlawful for any person to discharge or otherwise discriminate against a miner for bringing suspected violations of this act to the attention of authorities." 115 Cong.Rec. 27948. (Emphasis added.) By thus referring to "authorities" and coupling his amendment to those sections of the bill which dealt with inspections by an authorized representative of the Secretary, the Senator made it clear that the authorities he had in mind were mine inspectors or other designated agents of the Secretary. See Legislative History of the Federal Coal Mine Health and Safety Act 540–41 (Comm.Print 1970).

In his remarks on the floor Senator Kennedy noted that his proposed amendment to section 301(h) "gives to miners the same protection against retaliation which we give employees under other Federal labor laws." 115 Cong.Rec. 27948. Among the other Federal labor laws to which the Senator referred was the National Labor Relations Act. That act provides, 29 U.S.C. § 158(a)(4), that it shall be an unfair labor practice "to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter." It has been held however

that this section does not protect an employee who has not complained to the Board or one of its agents. Hoover Design Corp. v. NLRB, 402 F.2d 987 (6th Cir. 1968). See NLRB v. Scrivener, 405 U.S. 117, 125 n. 6, 92 S.Ct. 798, 31 L. Ed.2d 79 (1972).

I am puzzled by the majority's suggestion that Phillips came within the protection of section 110(b)(1) because he was "unfamiliar with the elaborate appeal and review procedure" established by the collective bargaining agreement. Neither do I understand the suggestion that the mine management was under a duty to explain matters to Phillips. I think the proper interpretation of the statute should not depend upon whether Phillips understood the collective bargaining grievance procedure. Moreover, I believe it was the function of the Union, which represented Phillips, and not the company, to explain the procedure to him if he was unable to understand it. In any event the record does not establish that Phillips was unfamiliar with the procedure; on the contrary he displayed considerable expertise in that field. He personally took his complaints to the Mine Safety Committee and he testified that he knew about this grievance procedure. (See addendum to Gov.Br. pp. 1a–3a.)

### III.

The majority concludes that the "bare words of the Safety Act . . . would be completely ineffective" unless "implemented by some procedure at the mine". I think this argument fails when examined in the light of the true scope of section 110(b)(1) and the additional remedies available to a miner who is concerned about his safety in the mine.

A miner who is concerned about conditions in the mine which he considers dangerous is protected by both his collective bargaining agreement and by section 502 of the Labor Management Relations Act, 29 U.S.C. § 143. In this case Phillips asserted his rights under the collective bargaining agreement and lost, because the umpire found that his

discharge did not violate the agreement. He then invoked his remedy under section 502 of the Labor Management Relations Act, and lost again, because the Regional Director of the NLRB held that conditions in the mine were not "abnormally dangerous" within the meaning of the statute. *See* Gateway Coal Co. v. UMW, 414 U.S. 368, 94 S.Ct. 629, 38 L.Ed.2d 583 (1974). Thus, before invoking the Mine Safety Act Phillips could and he did seek redress in two other forums, one provided by his contract, the other by statute. He was unsuccessful, not because procedures for redress were unavailable or defective, but because the evidence failed to support his claim.

Although the majority, citing a finding by the Examiner, suggests that Phillips' discharge did violate the collective bargaining agreement (Op. p. 780) this matter is not relevant to the issue before us. We are not reviewing the decision of the umpire. The only issue before us is whether Phillips' complaint to a fellow employee brought him within the protection of section 110(b)(1) of the Mine Safety Act; the question is not whether his discharge violated the collective bargaining agreement. Section 110(b)(1) forbids an employer to discharge a miner because he has notified the Secretary or his authorized representative of any alleged violation or danger; it is not directed at discharges for refusal to work or discharges in violation of a collective bargaining agreement.

The majority commends the Kencar Mine management and the Union for adopting "a procedure to bridge the gap between the miner in the pit and the Federal Bureau of Mines, the Secretary's representative." The majority then reasons that Phillips was protected against discharge because his complaint to his foreman was "the first prescribed step under the Kencar procedure to invoke the Mine Safety Act". I do not understand how an "authorized representative" of the Secretary can be created, and the scope of the statute expanded, by an agreement between the company and the Union. Assuming that the hiatus perceived by the majority exists —an assumption I think unwarranted, given section 502 of the Labor Management Relations Act—the gap can be closed only by act of Congress. The statute cannot be amended by a collective bargaining agreement.

IV.

The decision of the Board of Mine Operations Appeals rested on two independent grounds. First, the Board found there was no substantial evidence to support the finding of the Trial Examiner that Phillips was discharged because of his safety complaints and safety activities. After reviewing the evidence the Board found, contrary to the Examiner's conclusion, that the reason for the discharge was the refusal of Phillips to obey the direct order of his foreman to haul coal. Second, the Board found that even if the discharge were motivated by Phillips' safety complaints to the foreman and the Mine Safety Committee, as a matter of law this would not bring him within the scope of section 110(b)(1).

Holding that the Board's second independent ground was wrong, the majority is nevertheless bound by the Act to affirm the decision of the Board if the Board's conclusions of fact are supported by substantial evidence. Section 106(b) of the Act, 30 U.S.C. § 816(b), relating to judicial review of any order or decision issued by the Secretary or the Panel, provides: "The findings of the Secretary or the Panel, if supported by substantial evidence on the record considered as a whole, shall be conclusive."

Instead of examining the Board's findings to determine whether they are supported by substantial evidence, the majority selectively credits testimony, and proceeds to "reject the Board's suggestion that Phillips was discharged only for a simple refusal to work." The majority then finds as a fact "that the effective cause of Phillips' discharge was his complaint about hazardous working conditions in the mine"; and

the majority orders Phillips to be reinstated with back pay, costs, expenses and attorneys' fees.

In my judgment the majority opinion violates the standard of judicial review commanded by section 106(b). There was conflicting testimony in the record, but considering all the evidence introduced at the hearing, I cannot say there was no substantial evidence to support the Board's conclusion. Although my colleagues have drawn a different conclusion from the same facts this does not authorize them to upset the Board's findings and substitute their own. *See* Universal Camera Corp. v. NLRB, 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

V.

The impact of this decision on mine operations will be substantial. Even more important and significant, in my opinion, is the determination of my colleagues to override a clear and unambiguous statutory provision and substitute the broader protection which they believe miners ought to have as a matter of policy. This is an intrusion into the legislative domain in which I cannot join.

I respectfully dissent.