507 F.2d 1202
 165 U.S.App.D.C. 379, 1974-1975 O.S.H.D. ( 19,163
 Glen MUNSEY et al., Petitioners,
v.
Rogers C. B. MORTON, Secretary of the Interior, and the
Board of Mine Operations Appeals of the Department
of Interior, Respondents, Bituminous
Coal Operators Association,
Amicus Curiae.
 No. 72-2095.
 United States Court of Appeals, District of Columbia Circuit.
 Argued Dec. 21, 1973.
Decided Dec. 17, 1974.
 
 Steven B. Jacobson, Washington, D.C., for petitioners. Charles L. Widman, Washington, D.C., was on the brief for petitioners. Edward L. Carey, Willard P. Owens and J. Davitt McAteer, Washington, D.C., also entered appearances for petitioners.
 Judith S. Feigin, Atty., Dept. of Justice, with whom Farold H. Titus, Jr., U.S. Atty., at the time the brief was filed, and Walter H. Fleischer, Atty., Dept. of Justice, were on the brief for respondent. Thomas G. Wilson, Atty., Dept. of Justice, also entered an appearance for respondent.
 Guy Farmer, Washington, D.C., filed a brief on behalf of Bituminous Coal Operators' Assn. as amicus suriae.
 Before WRIGHT, ROBINSON and MacKINNON, Circuit Judges.
 SPOTTSWOOD W. ROBINSON, III, Circuit Judge:
 
 
 1
 Before us is a petition for review of a decision of the Board of Mine Operations Appeals of the Department of the Interior holding that a mine operator's termination of the employment of three miners did not contravene the Federal Coal Mine Health and Safety Act of 1969.[1] The specific complaint which petitioners advanced, and which the Board rejected, was that the operator, in terminating the employment, retaliated against them for reporting to federal authorities unsafe conditions in the mine, and thus discriminated against them in violation of Section 110(b)(1) of the Act.[2] Finding the Board's decision faulty on two counts, we remand the case to the Board for reconsideration of petitioners' claim harmoniously with the principles set forth in this opinion.
 
 I. BACKGROUND OF THE CASE
 A. Factual Background
 
 2
 The petitioners are Glen Munsey, Arnold Scott and Earnest Scott. Two are experienced coal miners,[3] and all are members of a local union of the United Mine Workers of America (UMWA). The involved employer is the Smitty Baker Coal Company, Inc., which operates a mine[4] in St. Charles, Lee County, Virginia, under a collective bargaining agreement with UMWA.[5] Munsey and Earnest Scott were employed by the company as jacksetters,[6] and Arnold Scott as a designated helper though he too sometimes worked as a jacksetter. Their duties were performed conjunctively with the operations of one of the continuous mining machines utilized in the company's mining process.[7]
 
 
 3
 On March 30, 1970, the Act's mandatory health and safety standards for underground coal mines went into effect.[8] Thereafter, the Smitty Baker mine was often the concern of federal inspectors,[9] and of petitioners as well. Munsey became a member of his union's three-man safety committee,[10] a post he held about two months, and both while a committeeman and afterwards he had occasion to speak to his supervisors about safety in the mine. Seemingly in collaboration with the Scotts, Munsey frequently contacted his union's safety coordinator[11] to complain of what he considered to be dangerous conditions.
 
 
 4
 On the morning of April 15, 1971, while petitioners performed their usual tasks as part of a team working one of two operating sections of the mine,[12] a five-ton rock fell from the mine roof on top of the mining machine in use,[13] causing the crew to retreat about 40 feet to a heavily timbered area. Clement Kempton, the crew foreman, and Fred Coeburn, foreman of the other section,[14] inspected the roof and pronounced it safe, whereupon the crew went back to work.
 
 
 5
 Minutes later, the operator of the mining machine told the crew that he thought the roof was 'dribbling'-- emitting debris, an omen of a loose roof about to fall. Petitioners went back to the heavily timbered area while another inspection of the roof was made. Again it was concluded that the roof was safe, and part of the crew returned to work. Petitioners, protesting that the roof was unsafe, refused to do so unless precautions were taken. Foreman Coeburn told them that instead of their customary activities they could set timbers,[15] and that petitioners also refused to do. Coeburn then sent them from the mine.[16]
 
 
 6
 On the surface, petitioners discussed with Frank Cochran, the mine superintendent, the events transpiring in the mine. Cochran told them that they could reenter the mine to set timbers, but petitioners were unwilling to do so. Petitioners asked whether they could come back to work the next day, and to that Cochran demurred. Cochran told them that they could return to work that day but not on the next, believing that to do otherwise would be unfair to the men who had stayed on the job.
 
 
 7
 Petitioners then left the mine site and reported the incident, including their apparent discharge, to E. W. Gilbert, the union safety coordinator.[17] On the afternoon of April 15, petitioners and Gilbert met with the manager and the superintendent of the mine, and Gilbert sought unsuccessfully to obtain petitioners' reinstatement.[18] Still later that afternoon, Gilbert reported the affair, including petitioners' apparent discharge, to a representative of the Bureau of Mines.[19] At another meeting on April 29, Gilbert again tried to persuade company officials to let petitioners return to their jobs. Though the only known instance of company dismissal of employees over a safety dispute, and despite the company's invariable practice of reinstating aggrieved miners after settlement of their grievances, the Company persisted in its decision to terminate petitioners' employment.[20]
 
 B. Administrative Background
 
 8
 Meanwhile, on April 21, petitioners had triggered the statutory mechanism for a review of their discharge by the Secretary.[21] Their amended petition alleged that they had been discriminatorily discharged for making safety complaints to the Bureau of Mines through their union coordinator,[22] and sought reinstatement, back pay and counsel fees.[23] The hearing on the charge[24] extended over three days, following which the hearing examiner ruled in their favor. The examiner found that the Smitty Baker management knew or had reason to believe that petitioners had frequently reported allegedly hazardous conditions to Safety Coordinator Gilbert, at least some of which Gilbert had transmitted to the Bureau of Mines, and that petitioners had similarly complained about the incident precipitating their discharge, which Gilbert had likewise sent to the Bureau, occasioning an inspection on the next day. The examiner also found that petitioners were twice discharged, once when Foreman Coeburn told them to leave the mine and again when Superintendent Cochran refused to reinstate them.[25] On the basis of these findings, the examiner held that both times the company had violated Section 110(b)(1) of the Act[26] 'by reason of the fact that (petitioners) had notified an authorized representative of the Secretary of Interior of an alleged violation or danger at (the company's) mine,' and 'because they notified their Union Safety Coordinator of alleged safety violations and dangers at (the) mine.'[27]
 
 
 9
 The company then took an appeal to the Department of the Interior's Board of Mine Operations Appeals, which reversed the trial examiner's decision.[28] To establish a violation of Section 110(b)(1), the Board said, it is ordinarily necessary for the complaining miner to carry the burden of proving[29] '(1) that (the) miner has reported to the Secretary or an authorized representative of the Secretary an alleged violation or danger in a coal mine; (2) that after such reporting occurred, such miner was discharged from his employment; and (3) that such discharge was motivated by reason of such reporting and not for some other reason.'[30] Rejecting the examiner's double-discharge analysis, the Board felt that petitioners were discharged, if at all,[31] when on April 15, after conferring with Superintendent Cochran, they declined to reenter the mine,[32] and that the evidence did not support a finding that at that time company management knew or believed that petitioners had previously made safety complaints through Safety Coordinator Gilbert to federal mine inspectors.[33] Therefore, the Board concluded, the reason for the discharge was nonretaliatory-- simply petitioners' refusal to return to work on that date[34] -- and the report which Gilbert made to the Bureau of Mines on the afternoon of April 15[35] was immaterial because petitioners had already been fired earlier that day. On petitioners' application for reconsideration, the Board affirmed its original decision,[36] and the petition for review by this court followed.[37]
 
 II. THE DISCHARGE
 
 10
 Petitioners urge us to set aside the Board's finding that when, on April 15, they were released from employment by the company,[38] its management was unaware of the role they had played in connection with reports of safety violations to federal authorities. Section 106(b) of the Act provides, however, that 'the findings of the Secretary, . . . if supported by substantial evidence on the record considered as a whole, shall be conclusive.'[39] Thus we may only consider whether the challenged finding is predicated on 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'[40] and by our assessment it is. The testimony of the company's supervisory personnel was quite uniformly that they did not know or believe that petitioners were in any way associated with prior safety reports,[41] and the circumstances upon which for a contrary inference petitioners rely, though impressive, were not compelling. It matters not how we might have resolved the issue; the question is whether the Board's resolution was irrational or unsupported by substantial evidence,[42] and we cannot say that it is.
 
 
 11
 But notwithstanding the Board's conclusion that the company lacked knowledge or belief of petitioners' involvement in the reports, the record reveals that on April 15, prior to any discharge, petitioners informed Foremen Kempton and Coeburn, and later Superintendent Cochran, that they feared the roof over their work area was unsafe.[43] The Board's decision does not reflect any consideration of the significance of those communications, ostensibly for the reason that the Board did not feel that reports to supervisory personnel of the company could be equated to reports to an 'authorized representative' of the Secretary within the meaning of Section 110(b)(1).[44] Our decision in Phillips v. Interior Board of Mine Operations Appeals,[45] announced after the Board had exhausted its function in the instant case, makes clear that in that regard the Board was in error.
 
 
 12
 Over a period of several months, Franklin Phillips and fellow miners had complained to their foreman, to the members of their mine safety committee and to their district safety coordinator about health and safety hazards in their work area, including excessive coal dust. Thereafter, Phillips was fired when he refused to forego an ongoing cleanout of a clogged water spray-which, functioning, would have reduced the dust-- in order to obey his foreman's order to return to work. In a proceeding pursuant to Section 110(b), the Board was of the opinion, as it was here, that 'complaints to the Mine Safety Committee would not make a prima facie case under the . . . Act, because the scope of protection of the Act is narrow. Complaints must be made to the Secretary or his authorized representative, not to fellow employees, supervisors, or the management of the mine.'[46] We rejected that view;[47] we held that 'Phillips' notification to the foreman of possible dangers is an essential preliminary stage in both the notification to the Secretary . . . and the institution of proceedings . . ., and consequently brings the protection of the . . . Act into play.'[48] We cautioned that Section 110(b)(1) did not become operative 'merely because a discharge originates in a disagreement between a foreman and a miner;'[49] at the same time, we turned down the suggestion 'that before a miner's safety complaint is accorded the protection of the . . . Act the coal miner must have instituted a formal proceeding with the Secretary of Interior or his representative.'[50] We said that 'rather, we look to: the overall remedial purpose of the statute . . .; the practicalities of the situation in which government, management, and miner operate; and particularly to the procedure implementing the statute actually in effect at the . . . mine.'[51] Measuring Phillips' situation by those considerations,[52] we concluded that Section 110(b)(1) had been violated.[53]
 
 
 13
 Phillips dictates the course we must take here. The complaints petitioners lodged with the two foremen and the superintendent on April 15, before any discharge occurred gave rise to the possibility that phillips may ultimately control the decision in this case. But while 'the overall remedial purpose of the statute'[54] is clear, the record in its present posture does not enable us to determine satisfactorily whether Phillips does govern. Unlike Phillips, we have here no findings either by the trial examiner or the Board as to 'the practicalities of the situation in which government, management, and miner operate,'[55] or 'particularly (as) to the procedure implementing the statute actually in effect at the (Smitty Baker) mine.'[56] Moreover, even if the facts in those respects equate petitioners' complaint to company personnel to notification of an arthorized representative of the Secretary, the Board must still ascertain whether petitioners were in fact discharged[57] and, if so, whether their complaint was the precipitating cause of the discharge.[58] In this milieu, we must remand the case to the Board for suitable determination of these matters, and, in consequence, a reappraisal of petitioners' claim in light of Phillips.
 
 III. THE REFUSAL TO REEMPLOY
 
 14
 There is yet another reason for which this case must be remanded to the Board for further proceedings. The Board addressed petitioners' grievance solely as a matter of dismissal from ongoing employment, and took the pivotal inquiry to be whether their assumed discharge on April 15, 1971, was motivated by some previous notification of the Secretary or an authorized representative of some alleged hazardous or illegal condition in the Smitty Baker mine. We note, however, that not only was there the dismissal on April 15, but also the company's refusals on that date and later on April 29 to reemploy petitioners after they had professed their willingness and desire to return to work.[59] We note, too, that the April 29 refusal followed the April 15 report by Safety Coordinator Gilbert to federal mine inspectors of petitioners' charge that the mine roof over the area they last worked was unsafe;[60] and we cannot assume, absent any finding whatever by the Board on this fubject, that Company officials did not know or have reason to believe that Gilbert did so.[61] We think, then, that aside from the Phillips points,[62] the Board erred in failing to consider whether the refusal to rehire petitioners rose to the level of a statutory violation.
 
 
 15
 Section 110(b)(1) provides, inter alia, that 'no person shall discharge or in any other way discriminate against . . . any miner . . . by reason of the fact that such miner or (any authorized) representative (of miners) . . . has notified the Secretary or his authorized representative of an alleged violation or danger . . ..'[63] Either a 'discharge' of a miner or another activity which 'in any other way discriminates against' him for that reason is plainly within the statutory prohibition. We think the statutory language fairly contemplates a refusal to reemploy a miner because he has seen fit to complain to an authorized representative of the Secretary about working conditions in the employer's mine.
 
 
 16
 In our Phillips opinion,[64] we emphasized the Act's remedial mission and its consequent entitlement to a liberal construction.[65] We pointed out that Section 110(b)(1) 'was introduced with the announced intention of giving to miners 'the same protection against retaliation which we give employees under other Federal labor laws."[66] We referred to NLRB v. Scrivener,[67] wherein the Supreme Court held that a provision of the National Labor Relations Act making it an unfair labor practice for an employer 'to discharge or otherwise discriminate against an employee because he has . . . given testimony under this Act'[68] was infringed by discharges of employees after they gave affidavits to a field examiner of the National Labor Relations Board.[69] We quoted the language of Scrivener that 'the presence of the preceding words 'to discharge or otherwise discriminate' reveals, we think, particularly by the word 'otherwise,' an intent on the part of Congress to afford broad rather than narrow protection to the employee.'[70] We declared that 'in the Mine Safety Act the words 'in any other way discriminate' may be similarly construed.'[71] The result we reached in Phillips was induced partly because, as we said, it 'best comports with the remedial purpose of the legislation.'[72] To be sure, our concern in Phillips was the meaning of Section 110(b)(1)'s reference to notification of the Secretary or his authorized representative of an alleged violation or danger as the reason for the employer action complained of.[73] But obviously all operative parts of a remedial statute invoke the canon that such statutes are to be construed liberally to enable achievement of legislative objectives.[74]
 
 
 17
 The end and aim of Section 110(b)(1) was the protection of miners against retaliation by mine operators prompted by a miner's complaint to the Secretary or his representative of a dangerous or illegal condition in the mine.[75] The retaliation the Section explicitly forbids is not limited to discharge, but extends to 'discrimination' against a miner 'in any other way' because of such a complaint.[76] We believe it clear enough from the statutory language alone that a refusal for that reason to reemploy a previously discharged miner is a 'discrimination' within the meaning of Section 110(b)(1). In any event, we are certain that the liberal construction which the statute merits must put to rest any lingering doubt on that score.
 
 
 18
 In the case at bar, the record discloses circumstances generating the possibility that the refusal of the Smitty Baker Company to rehire petitioners was motivated by the very consideration which Section 110(b)(1) proscribes. On the afternoon of April 15, 1971, after the meeting at which petitioners' plea for reinstatement in their jobs was turned down, Safety Coordinator Gilbert requested the Bureau of Mines to investigate the condition of the roof of the area of the mine in which petitioners had worked.[77] On April 16, a spot investigation was made by federal mine inspectors and, although the roof was found to be safe, the investigation uncovered ventilation problems in another area of the mine, on account of which the mine was shut down for two working days.[78] On April 29, at a second meeting, company officials again refused to allow petitioners to return to their jobs, although petitioners offered to do so without back pay and although the company had never before dishonored a miner's request for reinstatement.[79]
 
 
 19
 These circumstances clearly called for an inquiry as to whether the company's refusal on April 29 to rehire petitioners-- a 'discrimination' against them-- was because they, through Gilbert as their authorized representative, had on April 15 notified the Burear of Mines, as the Secretary's authorized representative, of the allegedly unsafe and illegal conditions in the mine.[80] The Board did not make that inquiry, notwithstanding petitioners' invocation of Section 110(b)(1) as the basis for their claim that they were entitled to restoration to their jobs. It may be that the Board, having concluded that petitioners' discharge on April 15 was attributable to their refusal earlier that day in the mine to return to work,[81] felt that the matter was at an end. But serely, the Board's finding on the reason for the firing on April 15, particularly in light of Gilbert's subsequent report to the Bureau of Mines, cannot be accepted as a finding on the reason to rehire on April 29. And if indeed the Board felt that a retaliatory refusal to rehire, unlike a retaliatory discharge, is legally innocuous, we would reject that myopic view of the statute.[82] The Board must now determine whether the Smitty Baker Company's refusal on April 29 to rehire petitioners was motivated by the consideration which Section 110(b)(1) makes taboo.
 
 
 20
 The decision of the Board of Mine Operations Appeals is vacated, and the case is remanded to the Board for further proceedings in conformance with this opinion.
 
 
 21
 So ordered.
 
 
 22
 MacKINNON, Circuit Judge, dissenting in part and concurring in part:
 
 
 23
 I dissent from the application to this case of the decision in Phillips v. Interior Board of Mine Operations Appeals, 163 U.S.App.D.C. 104, 500 F.2d 772 (1974). In my view Phillips is not applicable to this case on the facts and moreover I do not consider that Phillips correctly interprets the Mine Safety Act of 1969. My objection to Phillips is that it places an interpretation on the statute that is unsupported by the language of the statute and is overbroad. To apply Phillips to this case would be a further impermissible extension. A petition for certiorari is pending in Phillips. Petition for cert. filed sub nom. Kentucky Carbon Corp. v. Interior Board of Mine Operations Appeals, 43 U.S.L.W. 3318 (Nov. 21, 1974) (No. 74-623). When appellants sought reemployment or reconsideration of their discharge on April 29th, the report had been made to the authorized representative of the Secretary (the Bureau of Mines) so Phillips is clearly irrelevant at that time.
 
 
 24
 I thus concur in the remand of the case to the Board. In that hearing I would not concur in the application of Phillips principles. However, since appellants waived back pay, it is hard for me to understand why the men are not reemployed. That fact, if unexplained, may go further to proving appellants' case than any other single item of evidence.
 
 
 
 [1]
 Act of Dec. 30, 1969, Pub.L. No. 91-173, 83 Stat. 742, 30 U.S.C. 801 et seq. (1970)
 
 
 [2]
 'No person shall discharge or in any other way discriminate against or cause to be discharged or discriminated against any miner or any authorized representative of miners by reason of the fact that such miner or representative (A) has notified the Secretary or his authorized representative of any alleged violation or danger, (B) has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or (C) has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.' Federal Coal Mine Health and Safety Act of 1969, tit. I, 110(b)(1), 30 U.S.C. 820(b)(1) (1970)
 
 
 [3]
 When discharged, Earnest Scott had 28 years and Munsey 12 years of mining experience. Arnold Scott, son of Earnest Scott, had worked for the Smitty Baker Coal Company about nine months
 
 
 [4]
 It is a bituminous coal mine which, when the events in suit occurred, employed about 20 miners underground on two shifts per day, five days a week, and produced about 1,000 tons of coal a day. Then in operation about two and a half years, the mine was worked in two sections, each utilizing a double-auger coal-drilling machine
 
 
 [5]
 The agreement is the Bituminous Wage Agreement of 1968, between the union and the mine operators
 
 
 [6]
 The company's mining operations followed the height of a coal seam about 40 to 42 inches thick, affording a maximum mine roof level of approximately 42 inches. In each of its two sections was a foreman and a normal crew of seven men, whose functions were coordinated with those of the drilling machine. A jacksetter and two timbermen worked on each side of the machine, and the seventh crewman operated the machine
 Jacksetters and timbermen must work on their hands and knees, and are equipped with knee and elbow pads for that purpose. Each jacksetter sets a jack on his side of the machine, and the jacks are then raised until they are pressed securely against the roof and the floor. Ropes are extended from the two jacks to the machine, which pulls along the ropes as it works laterally across the face of the coal seam. As the machine moves from left to right, the two timbermen on the left side install timbers between the floor and the roof while the timbermen on the right 'knock down' their timbers ahead of the lateral motion of the machine. As the machine moves from right to left the process is reversed, the right timbermen installing timbers and the left timbermen knocking down their timbers. When the machine completes a cut into the working face, jacksetters take down their jacks and reset them in an advanced position on a line approximating the butt end of the machine augers. Between jacksetting and resetting, jacksetters shovel loose coal and coal dust against the working face to enable the machine to scoop it up as it makes its passes. While jacksetters work up to the working face, timbermen work somewhat behind jacksetters but still near the working face, in an area which is unprotected by permanent timbers.
 
 
 [7]
 See note 6, supra
 
 
 [8]
 Act of Dec. 30, 1969, Pub.L. No. 91-173, 509, 83 Stat. 803
 
 
 [9]
 In the administrative proceeding which was to follow, the trial examiner found that during the eight-month period beginning October 19, 1970-- the period for which statistical data were presented in evidence-- the mine was inspected 24 times by five inspectors who issued 32 notices of violations and two mineclosure orders for a variety of statutory violations
 
 
 [10]
 The mine safety committee was established by the collective bargaining agreement. As provided by the agreement, the committee inspects mine developments and equipment used in producing coal. If the committee believes that conditions exist which imperil miners, it reports its findings and recommendations to management; if the committee deems the danger imminent, it may recommend immediate evacuation of all miners from the endangered area, and that the operator is obliged to do
 Additionally, the committee may also assume a role as an informal grievance arbitrator. Safety problems may thus be brought to a member of the committee, who then discusses it with a mine foreman. If there is no amicable resolution, the committee member then reports the problem to the union's safety coordinator, who in turn may seek the aid of a federal mine inspector.
 
 
 [11]
 In each of its territorial districts, UMWA has created the position of safety coordinator to establish liaison between state and federal mine inspectors, and to deal more effectively with safety matters. The safety coordinator endeavors to resolve safety problems called to his attention by either a miner or a member of the safety committee. He first negotiates with the mine operator and, if necessary, contacts an inspector to arrange for a spot inspection. As a signatory to the collective bargaining agreement, the Smitty Baker Mine was given written notice of the establishment and function of the safety coordinator in its district
 
 
 [12]
 See note 6, supra
 
 
 [13]
 The rock apparently grazed Munsey's arm and bruised it, but the bruise did not disable him
 
 
 [14]
 See note 4, supra
 
 
 [15]
 Since petitioners' section of the mine could not operate unless Munsey and Earnest Scott continued to work as jacksetters, see note 6, supra, Foreman Coeburn thought that he would have to close down the section for the day. However, two other men offered to perform their jobs, and Coeburn then offered to let petitioners work as timberers. Timbersetting would have placed petitioners in the area of the rock fall, and would have continued to expose them to what they deemed a dangerous mine roof
 
 
 [16]
 After petitioners refused to return to work, Coeburn told them, 'if you ain't going to work, get your buckets and go home.' Coeburn warned them that if they left the mine, the superintendent might fire them
 
 
 [17]
 See note 11, supra
 
 
 [18]
 Gilbert expressed the view that petitioners' discharge for making a safety complaint was unlawful, especially in light of the fact that no previous dispute over a safety matter had resulted in termination of a miner's employment at the company's mine
 
 
 [19]
 On April 16, the day after the incident in the mine, the Bureau of Mines, in response to Gilbert's request, made a spot inspection which revealed that the roof in the area of the rock fall was normal and safe. The inspection uncovered ventilation problems in another area, however, as a result of which the mine was closed for two working days
 
 
 [20]
 Ralph Baker, manager of the mine, refused to allow petitioners to return to work. He felt that 'my foremen were right by telling them that if they wasn't going to work, to go on outside.' Baker indicated, however, that he might be able to use petitioners at some future date
 
 
 [21]
 'Any miner or a representative of miners who believes that he has been discharged or otherwise discriminated against by any person in violation of paragraph (1) of this subsection may, within thirty days after such violation occurs, apply to the Secretary for a review of such alleged discharge or discrimination. A copy of the application shall be sent to such person who shall be the respondent. Upon receipt of such application, the Secretary shall cause such investigation to be made as he deems appropriate. Such investigation shall provide an opportunity for a public hearing at the request of any party to enable the parties to present information relating to such violation. The parties shall be given written notice of the time and place of the hearing at least five days prior to the hearing. Any such hearing shall be of record and shall be subject to section 554 of Title 5. Upon receiving the report of such investigation, the Secretary shall make findings of fact. If he finds that such violation did occur, he shall issue a decision, incorporating an order therein, requiring the person committing such violation to take such affirmative action to abate the violation as the Secretary deems appropriate, including, but not limited to, the rehiring or reinstatement of the miner or representative of miners to his former position with back pay. If he finds that there was no such violation, he shall issue an order denying the application. Such order shall incorporate the Secretary's findings therein. Any order issued by the Secretary under this paragraph shall be subject to judicial review in accordance with section 816 of this title . . ..' Federal Coal Mine Health and Safety Act of 1969, tit. I, 110(b)(2), 30 U.S.C. 820(b) (2), (1970)
 
 
 [22]
 See note 11, supra
 
 
 [23]
 See note 21, supra
 
 
 [24]
 In an exercise of the rulemaking power conferred by 508 of the Act, 30 U.S.C. 957 (1970), the Secretary has promulgated regulations implementing the statutory procedure, see note 21, supra, for consideration and disposition of applications for administrative review of action assertedly violative of 110(b) (1). 30 C.F.R. 301.1 et seq. (1971). The statutorily-mandated hearing is conducted by an administrative law judge (formerly trial examiner), who renders a decision incorporating findings of fact and conclusions of law. Id. 301.60 to 301.74. Parties may appeal from that decision to the Board of Mining Operations Appeals, which renders the final administrative decision in the case. Id. 301.80 to 301.83
 
 
 [25]
 See Munsey v. Smitty Baker Coal Co., 79 Interior Dec. 501, 504 (1972)
 
 
 [26]
 See note 2, supra
 
 
 [27]
 Munsey v. Smitty Baker Coal Co., supra note 25, 79 Interior Dec. at 504
 
 
 [28]
 Munsey v. Smitty Baker Coal Co., supra note 25
 
 
 [29]
 30 C.F.R. 301.68 (1971) allocates the burden of proof
 
 
 [30]
 Munsey v. Smitty Baker Coal Co., supra note 25, 79 Interior Dec. at 505. The Board stated that while these are the elements of proof in most factual situations, it realized that it might be necessary to refine them on a case-by-case basis. For example, said the Board, if a mine operator discharged a miner under the erroneous belief that the miner had reported alleged violations or dangers to the Secretary, and that belief motivated the discharge, a violation of 110(b)(1) would occur. Id. at 505 n.7. The Board stated further:
 Clause (A) of subsection 110(b)(1) is intended to protect the reporting by miners of alleged safety violations or dangers in coal mines. However, the plain language of clause (A) of subsection 110(b)(1) limits the protection to reporting alleged violations or dangers to the Secretary or his authorized representative. It does not protect the makings of general safety protests or the reporting of alleged violations or dangers to fellow employees, supervisors, or the management of a coal mine. On the other hand, the miner need not personally make the report directly to the Secretary or to the authorized representative of the Secretary. It is sufficient if he instigates or provides the initial impetus for the required report, provided he intends that the report ultimately will be made to the Secretary or his authorized representative by someone else, who will serve as the medium for communicating the report.
 Id. at 505-506.
 
 
 [31]
 The Board had 'considerable doubt whether the . . . termination of (petitioners') employment was by discharge or voluntary quit. However, since the essence of our decision turns on the failure of proof as to the element of motivation, we assume, without deciding, that a discharge did, in fact, take place.' Id. at 507
 
 
 [32]
 See text supra following note 16
 
 
 [33]
 Manager Baker, Superintendent Cochran and Foreman Coeburn all denied any knowledge or belief as to reports by petitioners to Safety Coordinator Gilbert for relay to federal mine inspectors. Foreman Kempton, like Superintendent Cochran, testified that Munsey had complained about the quality of the air in the mine, but not that Munsey told him that he was going to report the condition to Gilbert. Petitioners introduced no direct evidence to the contrary, but relied instead upon the number and frequency of complaints to Gilbert as circumstantial evidence that company management either knew or had reason to believe that petitioners were involved. Munsey v. Smitty Baker Coal Co., supra note 25, 79 Interior Dec. at 507-10
 
 
 [34]
 The Board stated that if Kempton, Coeburn or Cochran, all management personnel, had intended to retaliate they hardly would have offered to return petitioners to work in the mine as timbermen. Id. at 511
 
 
 [35]
 See Text supra at note 19
 
 
 [36]
 Munsey v. Smitty Baker Coal Co., 79 Interior Dec. 676 (1972)
 
 
 [37]
 See 30 U.S.C. 816(a) (1970)
 
 
 [38]
 For purposes of our review, we must accept the premise, assumed by the Board, that petitioners were discharged near the end of their conversation with Superintendent Cochran on April 15. See note 31, supra, and accompanying text
 
 
 [39]
 30 U.S.C. 816(b) (1970)
 
 
 [40]
 Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)
 
 
 [41]
 See note 33, supra
 
 
 [42]
 See SEC v. Chenery Corp., 332 U.S. 194, 207, 67 S.Ct. 1575, 91 L.Ed. 1995 (1947); Columbia Broadcasting System v. FCC, 147 U.S.App.D.C. 175, 185, 454 F.2d 1018, 1028 (1971)
 
 
 [43]
 See text supra at notes 15-17
 
 
 [44]
 Munsey v. Smitty Baker Coal Co., supra note 25, 79 Interior Dec. at 506. See text supra at note 29
 
 
 [45]
 163 U.S.App.D.C. 104, 500 F.2d 772 (1974), petition for cert, filed, 43 U.S.L.W. 3318 (U.S. Nov. 21, 1974) (No. 74-623)
 
 
 [46]
 Id. at 109, 500 F.2d at 777. See note 30, supra, and accompanying text
 
 
 [47]
 Id. at 110-115, 500 F.2d at 778-783
 
 
 [48]
 Id. at 111, 500 F.2d at 779
 
 
 [49]
 Id
 
 
 [50]
 Id
 
 
 [51]
 Id
 
 
 [52]
 Id. at 111-113, 500 F.2d at 779-781. It was conceded by the mine operator that, pending resolution of a safety or health complaint, the operator's procedure indulged the miner the prerogative of refusing to work under conditions which he believed in good faith to be hazardous. Since Phillips felt that way about the dust in his work area, and was merely endeavoring to unclog the water spray before resuming work activities, we rejected the Board's suggestion that Phillips was discharged only for a simple refusal to work. We said that Phillips was not required to accept his foreman's evaluation of the danger; that plainly he had been discharged for not accepting the foreman's safety determination; and that the effective cause of his discharge was his complaint about working conditions in the mine. Id
 
 
 [53]
 Id. at 113, 500 F.2d at 781. We said that 'to hold that only a miner's discharge after he reaches the Bureau of Mines with his complaint is protected by the . . . Act, would mullify not only the protection against discharge but also the fundamental purpose of the Act to compel safety in the mines.' Id. We pointed out that unless 110(b)(1) is construed as it was in Phillips, 'it will be easy for management to avoid the prohibitions of the Act. If every miner who complained of safety device failures could be placed in Phillips' situation, the Act would be a hollow promise of protection; a foreman's determination of safety would become final.' Id. We added that 'to hold that only a discharge after a formal proceeding has been instituted is protected, but that a discharge after the miner has taken the first step in the complaint procedure by complaining to his foreman is not protected, would be to invite all employers to gut the . . . Act by quick discharges of complaining employees.'
 Id. at 113 n.32, 500 F.2d at 781 n.32.
 
 
 [54]
 See text supra at note 51
 
 
 [55]
 See text supra at note 51
 
 
 [56]
 See text supra at note 51
 
 
 [57]
 See note 31, supra
 
 
 [58]
 The Board's conclusion that the reason for the discharges was petitioners' refusal to go back to work was predicated upon the view that the company's management did not know or believe that petitioners had initiated safety complaints which reached federal mine inspectors, and consequently was not motivated by a desire to retaliate therefor. See text supra at notes 33-34 and note 34, supra. We think, however, that much more is involved. The evidence is clear that petitioners feared another rock fall from the roof, and our Phillips opinion makes plain that a miner may have the right to refuse to work under conditions believed in good faith to be dangerous. 163 U.S.App.D.C. at 111-112, 500 F.2d at 779-780. Like Phillips, the situation here was not, as the Board apparently thought, 'a simple refusal to work.' Id. at 780. It remains for the Board to reexamine its position on this aspect of the case
 
 
 [59]
 See text supra at notes 15-20
 
 
 [60]
 See text supra at notes 19-20
 
 
 [61]
 An important fact in this regard is that a federal inspection followed on the very next day. See note 19, supra
 
 
 [62]
 See Part II, supra
 
 
 [63]
 See note 2, supra
 
 
 [64]
 Phillips v. Interior Bd. of Mine Operations Appeals, supra note 45
 
 
 [65]
 163 U.S.A.pp.D.C. at 113, 500 F.2d 781-783
 
 
 [66]
 Id. at 114, 500 F.2d at 782, quoting Senator Kennedy, who introduced the floor amendment which eventuated as 110(b)(1) of the Act
 
 
 [67]
 405 U.S. 117, 92 S.Ct. 793, 31 L.Ed.2d 79 (1972)
 
 
 [68]
 29 U.S.C. 158(a)(4) (1970)
 
 
 [69]
 NLRB v. Scrivener, supra note 67, 405 U.S. at 120-125, 92 S.Ct. at 800-803
 
 
 [70]
 Phillips v. Interior Bd. of Mine Operations Appeals, supra note 45, 163 U.S.App.D.C. at 114, 500 F.2d at 782-783
 
 
 [71]
 Id. at 115, 500 F.2d at 783
 
 
 [72]
 Id
 
 
 [73]
 See Part II, supra
 
 
 [74]
 Peyton v. Rowe, 391 U.S. 54, 65, 88 S.Ct. 1549, 20 L.Ed.2d 426 (1968); Tcherepnin v. Knight, 389 U.S. 332, 336, 88 S.Ct. 548, 19 L.Ed.2d 564 (1967); National Automatic Laundry & Cleaning Council v. Shultz, 143 U.S.App.D.C. 274, 291, 443 F.2d 689, 706 (1971); Jordan v. Acacia Mut. Life Ins. Co., 133 U.S.App.D.C. 224, 228, 409 F.2d 1141, 1145, cert. denied, 395 U.S. 959, 89 S.Ct. 2101, 23 L.ed.2d 746 (1969)
 
 
 [75]
 115 Cong.Rec. 27948 (1969) (remarks of Senator Kennedy)
 
 
 [76]
 See note 2, supra
 
 
 [77]
 See text supra at notes 18-19
 
 
 [78]
 See note 19, supra
 
 
 [79]
 See text supra at note 20
 
 
 [80]
 See text supra at notes 19-20
 
 
 [81]
 See text supra at notes 31-33
 
 
 [82]
 See text supra at notes 63-76