**INTERNATIONAL PAPER COMPANY, Plaintiff-Appellant,**

**v.**

**FEDERAL POWER COMMISSION, Defendant-Appellee.**

**Nos. 258-9, Dockets 34265, 34991.**

United States Court of Appeals, Second Circuit.

Argued Dec. 7, 1970.

Decided March 2, 1971.

Howard E. Wahrenbrock, Washington, D. C., for plaintiff-appellant.

Peter H. Schiff, Sol., Washington, D. C. (Gordon Gooch, Gen. Counsel, George Lewnes, Asst. Gen. Counsel, Israel Convisser, Atty., Robert C. McDiarmid, Asst. to the Gen. Counsel, Washington, D. C., on the brief), for defendant-appellee.

Before LUMBARD, Chief Judge, FEINBERG, Circuit Judge, and CLARIE, District Judge.*

CLARIE, District Judge:

This appeal from a decision of the Federal Power Commission (FPC) claims that the Commission unlawfully attempted to extend its jurisdiction beyond its statutory authority; and that in the performance of its duties, it not only had violated "the separation of functions" provisions of the Administrative Procedure Act, 5 U.S.C. § 554(d), but also the Freedom of Information Act, 5 U.S.C. § 552. For purposes of this appellate review, there has been consolidated in the appeal, a related court decision from the Southern District of New York, dismissing the International Paper Company's (International's) separate court action requesting the production of certain Commission records alleged to have been wrongfully withheld (5 U.S.C. § 552(a) (3)).

The case presents for judicial determination: (1) the novel issue of whether a company's "own-use" transportation of natural gas through company-owned pipelines across state lines is within the jurisdiction of the FPC; (2) whether staff memoranda underlying prior Commission orders, and relating to precedent cases, as well as the present proceeding, is required to be disclosed under the Freedom of Information Act; and (3) whether the Commission's order in this proceeding was unlawful, because certain legal staff members had violated 5 U.S.C. § 554(d), by participating in both the investigatorial and prosecutorial functions of the Commission against International and had in addition advised the Commission in reaching its ultimate decision. We affirm both the decision of the Commission and the District Court on all issues.

FACTS

The stipulation of facts discloses that International operated a paper manufacturing plant at Natchez, Mississippi, which required substantial quantities of natural gas in its manufacturing processes. Initially, it had purchased this fuel under a standard utility service sales arrangement, from a pipeline company which was admittedly subject to the Commission's jurisdiction under the Natural Gas Act. However, in September, 1963, International executed a new agreement with Humble Oil and Refining Co. (Humble), a corporate affiliate of the Standard Oil Company of New Jersey, to purchase gas at the tailgate of Humble's processing plant in Lake St. John Field, Louisiana, which would be transported by International through a pipeline crossing the state line to the Natchez, Mississippi, plant for its own industrial consumption.

This 17.83 miles long pipeline was originally financed and built by Humble, at the latter's sole expense for a total cost of $450,573.10. In February 1964, it conveyed to International title to the pipeline pursuant to a product use agreement. As part of the consideration for this arrangement, International agreed to purchase quantities of gas from Humble through said pipeline at 23¢ per Mcf. The agreement contained a proviso that if the Natchez plant ceased to purchase gas from Humble's Louisiana refinery prior to the agreed termination date, International would be obligated to reimburse Humble for liquidated damages, to the extent of the unamortized remaining balance of the pipeline-cost, as determined by an agreed formula. In 1967, International was purchasing about one-quarter of its supply from its old source (Humble Gas Transmission Co.)

* Of the District Court of Connecticut, sitting by designation.

and three-quarters of its needs through its newly acquired pipeline.

The new contract between International and Humble first came to the attention of the Commission in mid-1965, when its secretary noticed that the 1963 contract of International with Humble Gas Transmission Co. also referred to the new source of supply. Thereupon, the FPC's Bureau of Natural Gas corresponded with International suggesting that the transaction was within the jurisdiction of the Commission and that it should either apply for a certificate of public convenience or seek a disclaimer of jurisdiction.

When these attempts to resolve the matter were resisted, the Commission issued an order in September 1967, directing International to show cause why its transportation of natural gas should not be subject to the Commission's jurisdiction under § 1(b) of the Natural Gas Act and why International should not be required to apply for and obtain a certificate of public convenience and necessity under § 7(c) and (e) of the Act to operate a transmission line across a state line.

International then requested the Commission's secretary to disclose to International all staff memoranda in three earlier disclaimer cases, which it claimed related to similar rulings affecting other companies. It represented that the Commission's holdings in those cases established legal precedents relevant to sustain its own situation. After a hearing before the Commission on October 9, 1967, the requested disclosure was denied; and thereafter on November 30, 1967, its petition for a rehearing was denied.

After a factual hearing on the merits, the hearing examiner found on December 13, 1968, that the Commission did have jurisdiction over the subject matter and his ruling was later affirmed by the FPC on July 29, 1969. It held that the transportation of natural gas by International was interstate in character and subject to Commission regulation under the authority granted by the Natural Gas Act.

On August 28, 1969, International petitioned for a rehearing, at which time it raised an ancillary issue to the jurisdiction question claiming that the Administrative Procedure Act (APA) provisions 5 U.S.C. § 554(d) had been violated by the Commission, because the staff attorney had acted in cooperation with the Assistant General Counsel and the General Counsel in the processing of the enforcement order. International complained that it had thus engaged in both the investigatorial and prosecutorial functions of the Agency and at the same time had participated in an advisory capacity, when the Commission reviewed the case and prepared its decision.

International appealed the Commission's decision on the jurisdiction issue to this Court on November 21, 1969. That same day, a separate court action was commenced in the Southern District of New York against the FPC requesting an order to obtain all staff memoranda in the Commission's files relating to previously decided cases [1] which International claimed established a Commission precedent, which must be followed here. It also asked for a similar staff memoranda relating to its own proceedings before the Commission. However, the latter's Secretary disclosed that this information was non-existent, therefore that request becomes moot. On May 15, 1970, the District Court granted the Commission's motion to dismiss International's action, and from

1. These cases were:
Anchor Hocking Glass Corporation, Docket No. G–204, as reported at 2 F.P.C. 930.
Jersey Central Power & Light Company, Docket No. G–1324, as reported at 9 F.P.C. 717.

The Montana Power Co., Docket No. G–1627, as reported at 10 F.P.C. 950. and the Reynolds Metals Company litigation.

this decision an appeal has been taken. On June 23, 1970, this Court granted a motion to consolidate both the appeal from the Commission's order and the District Court judgment for purposes of hearing and review.

### JURISDICTION ISSUE

The jurisdiction issue simply stated is whether International's transportation of its own natural gas, under the conditions hereinbefore set forth, is subject to FPC's supervision and control, thus requiring a certificate authorizing such interstate transportation or in the alternative, an order disclaiming Commission jurisdiction. The relevant sections of the Natural Gas Act provide:

15 U.S.C. § 717(b):

"The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce * * * and to natural-gas companies engaged in such transportation * * * but shall not apply to any other transportation * * * of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas."

15 U.S.C. § 717a(6):

" 'Natural-gas company' means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale."

15 U.S.C. § 717a(7):

" 'Interstate Commerce' means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States."

The Supreme Court faced a similar issue in Federal Power Commission v. East Ohio Gas Co., 338 U.S. 464, 70 S. Ct. 266, 94 L.Ed. 268 (1950), where the respondents were transporting natural gas solely for public consumption within the State of Ohio. The respondents there contended that the word "trans-portation" in § 717(b) *supra* must be "construed as applying only to companies engaged in the business of transporting gas in interstate commerce for hire or for sales to be followed by resales, whereas East Ohio does neither" (at 468, 70 S.Ct. at 268). Justice Black rejected the argument finding that:

"(T)he Act's language did not express any such limitation. * * * As we pointed out in Panhandle Eastern Pipe Line Co. v. Public Service Comm'n, 332 U.S. 507, 516, 68 S.Ct. 190, 195, 92 L.Ed. 128 (717(b)) made the Natural Gas Act applicable to three separate things: '(1) the transportation of natural gas in interstate commerce; (2) its sale in interstate commerce for resale; and (3) natural gas companies engaged in such transportation or sale.' And throughout the Act 'transportation' and 'sale' are viewed as separate subjects of regulation. They have independent and equally important places in the Act. Thus, to adopt respondents' construction would unduly restrict the Commission's power to carry out one of the major policies of the Act" (at 468, 70 S.Ct. at 269).

In an accompanying footnote, he distinguished the cases cited by appellant, the *Pipe Line Cases*, 234 U.S. 548, 34 S. Ct. 956, 58 L.Ed. 1459 (1914) (Uncle Sam Oil Company), which held in part that the Interstate Commerce Act did not encompass "transportation" when the company was "simply drawing oil from its own wells across a state line to its own refinery, for its own use, and that is all * * *." He comments: "This holding as to the meaning of transportation in the Interstate Commerce Act, 49 U.S.C.A. § 1 et seq., has slight force, if any, in determination of the word's meaning under this different and far more comprehensive Act" (338 U.S. 469, n. 9, 70 S.Ct. at 269).

Despite this clear explication of the meaning of transportation in interstate commerce under the Natural Gas Act, appellant contends that its operation,

while admittedly between two states, does not fall under the terms of the Act, because the Congress has given the FPC jurisdiction only to the limits of the "Attleboro gap." This picturesque phrase developed from events occurring after the Supreme Court's decision in Public Utilities Commission of Rhode Island v. Attleboro Steam & Electric Company, 273 U.S. 83, 47 S.Ct. 294, 71 L.Ed. 549 (1927) which checked Rhode Island's attempt to set rates on an electric company receiving power from Rhode Island in Massachusetts as a direct burden on interstate commerce. Subsequently, the Natural Gas Act was passed in 1938 with the intent to provide Federal regulation in the area declared by *Attleboro* to be immune from State regulation. As was pointed out in Panhandle Eastern Pipe Line Co. v. Public Service Commission of Indiana, 332 U.S. 507, 517, 68 S.Ct. 190, 195, 92 L.Ed. 128:

> "The Act, though extending federal regulation, had no purpose or effect to cut down state power. On the contrary, perhaps its primary purpose was to aid in making state regulation effective, by adding the weight of federal regulation to supplement and reinforce it in the gap created by the prior decisions."

See also, Federal Power Commission v. Southern California Edison Co., 376 U.S. 205, 84 S.Ct. 644, 11 L.Ed.2d 638 (1964) where the Court noted with reference to a similar statutory section of the Federal Power Act:

> "* * * Congress meant to draw a bright line easily ascertained, between state and federal jurisdiction, making unnecessary such case-by-case analysis" (at 215–216, 84 S.Ct. at 651).

Merely because Congress in passing the Natural Gas Act, did not totally preempt the field of State regulation, does not compel this Court to conclude that International's transportation of natural gas across state lines was not within FPC jurisdiction. Such an argument was made in *East Ohio Gas, supra,* based on the "gap" in which Congress

had regulated, to contend that transportation across state lines for consumption was without the coverage of the Act. While Justice Black "adhere(d) to those statements" of the Court on the "Attleboro gap," he did not concede that this made the gas company's enterprise nonjurisdictional.

> "(Congress) therefore acted under the federal commerce power to regulate what these decisions had indicated that the states could not. We have already held that in so doing Congress subjected to federal regulation a company transporting interstate gas, and selling it for resale, wholly within one state. * * * The only respect in which East Ohio differs from the company is that it sells gas direct to consumers rather than for resale. This difference is immaterial. For as we have already pointed out, East Ohio comes directly within the express provision granting power to the Commission to regulate 'transportation of natural gas in interstate commerce,' just as the Illinois company came directly within the express provision covering sale for resale" (338 U.S. at 473, 70 S.Ct. at 271).

■ Similarly, the appellant's activities fall directly under the terms of the Act as to transportation of gas in interstate commerce and are properly subject to FPC regulation. No case has been cited by the appellant that would indicate that this type of transportation was immune from federal regulation. Indeed if contract arrangements of this type were to be condoned and thus encouraged, it would so limit the Commission's authority as to defeat the purposes of the Act. References in both Panhandle Eastern Pipe Line Co. v. Pub. Service Comm. of Indiana, *supra,* and Panhandle Eastern Pipe Line Co. v. Michigan Public Service Commission, 341 U.S. 329, 71 S.Ct. 777, 95 L.Ed. 993 (1951) so indicate. In these latter cases a pipe line company sought to defer local state regulation of its direct sale to industrial consumers on the grounds that such sales were subject to the jurisdic-

tion of the FPC. The courts rejected these contentions. While holding that the sales were subject to state regulation and not within the "Attleboro gap," nevertheless, it held that the actual transportation of the gas by the pipe line company across state lines to the point of the direct sale was still under FPC jurisdiction and in interstate commerce. In the Indiana case, for example, the contention was made that to allow the States these regulatory powers over the sales would lead to conflicts between each of the states and between the states and the FPC. The court replied:

"There is no evidence thus far of substantial conflict in either respect and we do not see that the probability of serious conflict is so strong as to outweigh the vital local interests to which we have referred requiring regulation by the states. Moreover, if such conflict should develop, the matter of interrupting service is one largely related, as appellees say, to transportation and thus within the jurisdiction of the Federal Power Commission to control, in accommodation of any conflicting interests among various states" (332 U.S. at 523, 68 S. Ct. at 198).

Therefore, the conclusion must be drawn that appellant's transportation of natural gas is "in interstate commerce" as used in the Natural Gas Act and not outside the "Attleboro gap." International's transportation differs from the *Panhandle* transportation in that International itself is the ultimate industrial purchaser, who is transporting its purchased gas across state lines. This hair-splitting over who is the transporter of the commodity is immaterial under the Gas Act. Analogously, the Court in *East Ohio* declared:

"We find no language in the Act indicating that Congress meant to create an exception for every company transporting interstate gas in (this instance). Regardless of whether it might have been wiser and more farseeing statesmanship for Congress to have made such an exception, we should not do so through the interpretative process. There is nothing in the legislative history which authorizes us to interpret away the plain congressional mandate" (338 U.S. at 474, 70 S.Ct. at 272).

Moreover in the structuring of this transaction, the parties have avoided the case of F. P. C. v. Transcontinental Gas Pipe Line Corp., 365 U.S. 1, 81 S.Ct. 435, 5 L.Ed.2d 377 (1961) which held that federal jurisdiction extended under the Natural Gas Act to determine whether direct sales of gas would lead to economic waste or pricing difficulties. These considerations were held proper areas for FPC deliberation, because the Court found that appellant's construction left an "attractive gap" in the regulations, which it was the intent of Congress to close. Mere formalisms urged by the appellant in the present case should not be able to alter this policy of Congress reaffirmed by the Court in the *Transcontinental* case.

International's reliance on the United Gas Pipe Line Co. v. FPC case, 385 U.S. 83, 87 S.Ct. 265, 17 L.Ed.2d 181 (1966) is misplaced. While Justice White does refer at page 89, 87 S.Ct. 265 to certain specific transportation activities such as for hire, or for sale, and whether the sale is for consumption or resale, he concludes that all of this constitutes transportation in interstate commerce under the Act; and his list is not exclusive. He equates transportation of natural gas under the Act with "the movement of gas in interstate commerce." The opinion does not indicate, that just because the transportation across state lines is for one's own use, it should be outside of FPC jurisdiction. Rather he unequivocally states,

"The Act gives the Commission jurisdiction over interstate transportation of natural gas as a separate and distinct matter * * *." (at 89, 87 S. Ct. at 269).

One of the appellant's major arguments is that there were four disclaimers issued by the Commission in

**1356**

previous years that appear to cover transactions similar to that which is attempted here and that these prior disclaimers established precedents which should control. These disclaimers hereinbefore referred to include: *Anchor Hocking, Jersey Central, Montana Power,* and *Reynolds Metals.*

It is a well established law, however, that questionable decisions of adjudicatory bodies may be overruled in appropriate circumstances. As Justice Frankfurter stated in Helvering v. Hallock, 309 U.S. 106, 60 S.Ct. 444, 84 L.Ed. 604 (1940):

"We recognize that *stare decisis* embodies an important social policy. It represents an element of continuity in law, and is rooted in the psychologic need to satisfy reasonable expectations. But *stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable * * *." (at 119, 60 S.Ct. at 451).

"This Court, unlike the House of Lords, has from the beginning rejected a doctrine of disability at self-correction" (at 121, 60 S.Ct. at 452–453).

In matters involving the FPC, it has also been recognized that the power to break the chain of precedents exists. In Phillips Petroleum Co. v. Wisconsin, 347 U.S. 672, 74 S.Ct. 794, 98 L.Ed. 1035 (1954), the Court subjected independent producers of natural gas to FPC jurisdiction. In reviewing the prior decisions of the Commission, the Court noted that there were certain inconsistencies, but even if all prior decisions were in Phillips' favor these could be overruled, because "even consistent error is still error" (678, n. 5, 74 S.Ct. 794).

And similarly, in the *Permian Basin Area Rate Cases,* 390 U.S. 747, 88 S.Ct. 1344, 20 L.Ed.2d 312 (1968), the Court in discussing a Power Commission action said:

"Nor may its order properly be set aside merely because the Commission has on an earlier occasion reached another result; administrative authorities must be permitted, consistently with the obligations of due process, to adapt their rules and policies to the demands of changing circumstances" (at 784, 88 S.Ct. at 1369).

The disclaimers relied upon here were such that they could be validly overruled. None of the four cases were contested and disposition was essentially on a consent basis. Since both sides were in agreement, there was no judicial review. The earliest of the disclaimers, *Anchor Hocking,* was granted under the language of the Act as it read in 1938 and not in 1942,[2] after an amendment went into effect, described in *East Ohio, supra,* as "broadening the Commission's powers over the construction or extension of pipe lines" (338 U.S. at 468, 70 S.Ct. at 269).

The limits of the Commission's jurisdiction have been constantly under review and subject to interpretation since the passage of the Act and it has not remained in the same mold throughout the years. The Supreme Court, as recently as 1961, clarified the jurisdiction of FPC to regulate end uses and prices in certain direct sales. *Transcontinental Gas Pipe Line Corp., supra.* Therefore, this Court finds appropriate the overruling of these disclaimers on the grounds stated in the Commission's Order (App. 305, para. 38): "Partly as a result of a modified statutory standard and partly as the product of accumulated experience."

■ Finally, the Court rejects the argument of appellant that there is no prior administrative error here for the Commission to overrule, because the Third Circuit has approved these

2. The Natural Gas Act, subsection 7(c) was amended and subsections 7(d), (e), (f) and (g) were added February 7, 1942 by Public Law No. 444, 77th Congress, Chapter 49, 2d Session (H.R. 5249), 56 Stat. 83, 84; it is also 15 U.S.C. § 717f (c through g).

precedents in Public Service Electric & Gas Co. v. FPC, 371 F.2d 1, 5 (3rd Cir. 1967). In that case, however, natural gas was being taken as a bailment by Transcontinental Gas Pipe Line Corporation to Texaco's plant terminus in West Deptford, New Jersey. The interstate transportation by Transcontinental admittedly was subject to Commission regulation. The sole issue presented, therefore, was whether Texaco's transmission of the gas through its own 4-mile long pipeline located solely within the state of New Jersey was subject to the Commission's jurisdiction as well. The Commission determined that the transportation by Texaco was not subject to the Commission's jurisdiction since the "pipeline was an integral part of its plant facility and that interstate commerce ceased when the transported gas was redelivered at the terminus" (at 5). The Court agreed with this decision under those specific circumstances. It mentioned the disclaimers at issue here, as supportive of its decision; but its comment was merely dicta and cannot support the assertion of appellant that these disclaimers have been endorsed by the Court in every situation. The court there was not presented with the present issue and did not decide it.

## COMMISSION'S DUAL ROLE

■ International's second contention alleges that the General Counsel and possibly other FPC employees participated in both the prosecution of the proceeding against International and in the ultimate formulation of the Commission's decision. It claims this procedure to be violative of the general conceptions of due process, in addition to the statutory prescriptions of APA § 554(a) and (d). Without delving into a consideration of whether International has successfully brought itself within the shelter of this statute, or is otherwise entitled to constitutional protection, by showing that this is an adjudicatory proceeding and not one for initial licensing, the Court dismisses this contention of the appellant on the grounds that it has condoned and waived this point.

The alleged procedural violation was raised initially at the time of the rehearing, when correction was impossible. However, International represents that it was under no obligation to object earlier, because it had no notice of this irregularity until it learned that the General Counsel had failed to exclude himself from the decision making session of the FPC on July 29, 1969. The petition for rehearing filed August 28, 1969, first broached the issue; and at that time indicated no new evidence had been discovered. International's claim was that it had been "informed and believes that under the practice followed in the conduct of the Commission's business" this irregularity had occurred (at 354). As a matter of fact, International's counsel was unusually well informed as to the Commission's regular procedures, for he had served as an employee of the Commission for some 30 years. A considerable part of this time, he had occupied the position of Assistant General Counsel or as its Solicitor and was thoroughly familiar with all of the intricate facets of the Commission's administrative procedures.

Appellant made no timely challenge to this purported practice nor did counsel call it to the attention of the Commission at the time the stipulation of facts agreed to had been reviewed and approved by the Assistant General Counsel and General Counsel, before the supposed error was committed. This knowing inaction and calculated lying in wait, taken with the hope of upsetting a future adverse decision of the Commission, constituted a waiver of appellant's rights. As was pointed out in the case of SEC v. R. A. Holman & Co., 116 U.S. App.D.C. 279, 323 F.2d 284 (1963) (Burger, J.), which involved a challenge to a Commission member on the basis of conflict of interest:

"The party asserting disqualification must make his record in the administrative hearing. While the scope and nature of that inquiry has never been fully delineated it must be sufficient to allow the challenging party to in-

troduce whatever relevant evidence he possesses bearing on disqualification since he, of course, has the burden of proof" (323 F.2d at 287).

Furthermore, all the factual issues had been stipulated to. International cannot claim now that any prejudice resulted from the alleged error, in allowing the General Counsel or his assistant to approve the stipulation of facts and thus be accused of participating in the disposition of the case in a dual capacity, contrary to the statute.

## FREEDOM OF INFORMATION ISSUE

International requested in the District Court case that the Commission should be ordered to disclose all staff memoranda transmitted to it, from its General Counsel or its Bureau of Natural Gas in four separate matters, where it was claimed that the Commission's action favored the legal position taken by International here. These included: *Anchor Hocking Glass Corporation,* 2 F.P.C. 930 (1941); *Jersey Central Power & Light Company,* 9 F.P.C. 717 (1950); *Montana Power,* 10 F.P.C. 950 (1957); and a letter from Reynolds Metal Co. and FPC's response on March 6, 1959 and March 27, 1959, respectively.

International maintains that these records should have been made available to it under FIA § 552(a) (3) which requires:

"(E)ach agency, on request for identifiable records made in accordance with published rules stating the time, place, fees to the extent authorized by statute, and procedure to be followed

shall make the records promptly available to any person."

The Commission took the position that it had the right to reject this request pursuant to FIA § 552(b) (5), which provides:

"This section does not apply to matters that are—

\* \* \* \* \* \*

"(5) inter-agency or intra-agency memorandums or letters which would not be available by law to a party other than an agency in litigation with the agency."

In other words, the position which the Commission adopted was simply that the same Federal Rules of Civil Procedure, applicable to discovery in civil suits in the District Courts, determined whether Commission records were required to be made available to the movant under FIA.

■■ Applying these standards, the District Court found that the material sought by the appellant were not "orders" of the Commission nor were they "necessary parts" thereof. We agree with this finding, because the views of individual members of the Commission's staff are not legally germane, either individually or collectively to the actual making of final orders. They could be grossly misleading, when applied to the ultimate findings and conclusions reached by the FPC as a whole, because at best they are only advisory in character.[3] To allow disclosure of these documents would interfere with two important policy considerations on which § 552(b) (5) is based: encouraging full

---

3. The Memoranda sought were:

    (1) Memoranda from General Counsel or an Assistant General Counsel to the Commission or to a Commissioner which memoranda include legal analysis and recommendations, legal conclusions, and policy recommendations;

    (2) Memoranda from the Bureau of Accounts, Finance and Rates to the Commission which memoranda contain legal conclusions (or suggest a legal conclusion) and recommendations;

    (3) A Memorandum from the Division of Licensed Projects to the Commission,

dated March 22, 1951, described certain oil and gas fields, leases and production in the area affected by the application, in response to a request of the Commission; and

    (4) A Memorandum from the Bureau of Rates and Gas Certificates to the Commission, dated March 20, 1951, containing a description of the applicant's proposed operation, discussion of legal precedents, an opinion as to jurisdiction, and a request for advice as to what reply should be made to applicant's inquiry.

and candid intra-agency discussion, and shielding from disclosure the mental processes of executive and administrative officers. See Carl Zeiss Stiftung v. V. E. B. Carl Zeiss, Jena, 40 F.R.D. 318 (D.D.C.1966), aff'd sub nom. V. E. B. Carl Zeiss, Jena v. Clark, 128 U.S.App. D.C. 10, 384 F.2d 979 (1967). These policies are analogous to those underlying the attorney-client privilege, and appellant fails to show a compelling need for disclosure of the documents herein.

There is embodied in § 552(b) (5) "the privilege, customarily enjoyed by the Government in its litigations, against having to reveal those internal working papers in which opinions are expressed and policies formulated and recommended." Ackerly v. Ley, 137 U. S.App.D.C. 133, 420 F.2d 1336 (1969). See also, Consumers Union of United States v. Veterans Administration, 301 F.Supp. 796 (S.D.N.Y.1969), appeal dismissed as moot, 436 F.2d 1363 (2d Cir., Jan. 15, 1971). The appellant's requested discovery must be denied under the fifth exception, because it seeks the disclosure of items used in the FPC's deliberative processes.

International contends that since the disclaimers cannot be fully understood without reference to the staff memoranda, these memoranda must be disclosed under FIA § 552(a) (2) as final orders. However, the staff memoranda sought can in no way be construed, as being a part of the Commission's final orders. They were merely preliminary interagency memoranda, compiled preparatory to the formulation of the Commission's final decisions. American Mail Line, Ltd. v. Gulick, 133 U.S.App.D.C. 382, 411 F.2d 696 (1969) relied on as precedent by the appellant is not apposite. In that case, the memorandum sought was incorporated into the final order and administrative decision of the agency; and was specifically referred to as the sole basis for its decision. Thus "(w)hen it chose this course of action 'as a matter of convenience' * * * the memorandum lost its intra-agency status and became a public record, one

which must be disclosed to appellants" (at 703). The Court, in that case, specifically stated that it was "a unique case, and must be dealt with as such" (at 701).

International's contention that the staff of the Commission is an "agency" as defined in 5 U.S.C. § 551(1) is not tenable. As the District Court so properly pointed out:

"There is no organization designated 'the Staff' nor any justification for the capital letter; there are employees of the Commission called collectively 'the staff' but they have no authority individually or collectively to make 'orders.' Only the Commission makes orders."

The Commission's decision appealed from and the judgment of the District Court are accordingly affirmed.