Glenn MUNSEY, Petitioner,

v.

**FEDERAL MINE SAFETY & HEALTH REVIEW COMMISSION, Respondent,**

Smitty Baker Coal Co., Inc., et al., Intervenors.

No. 77–1619.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 22, 1978.

Decided Nov. 29, 1978.

Steven B. Jacobson, Washington, D. C., for petitioner.

Freddi Lipstein, Atty., Dept. of Justice, Washington, D. C., with whom Barbara Allen Babcock, Asst. Atty. Gen., and Morton Hollander, Atty., Dept. of Justice, Washington, D. C., were on the brief, for respondent.

J. Edward Ingram, Knoxville, Tenn., was on the brief for intervenors.

Robert E. Kopp and William Kanter, Attys., Dept. of Justice, Washington, D. C., also entered appearances for respondent.

Before McGOWAN and TAMM, Circuit Judges, and JUNE L. GREEN,* United States District Judge for the District of Columbia.

Opinion for the court filed by TAMM, Circuit Judge.

TAMM, Circuit Judge:

In this case we are called upon to review for the second time a decision of the United States Department of the Interior Board of Mine Operations Appeals (the Board) holding that Glenn Munsey was not discriminated against in violation of section 110(b) of the Federal Coal Mine Health and Safety Act of 1969 (the Act, 30 U.S.C. § 820(b) (1976).[1] Although we do not accept all of

---

* Sitting by designation pursuant to 28 U.S.C. § 292(a).

1. 30 U.S.C. § 820(b) (1976) provides:

(1) No person shall discharge or in any other way discriminate against or cause to be discharged or discriminated against any miner or any authorized representative of miners by reason of the fact that such miner or representative (A) has notified the Secretary [of the Interior] or his authorized representative of any alleged violation or danger, (B) has filed, instituted, or caused to be filed or instituted any proceeding under this chapter, or (C) has testified or is about to testify in any proceeding resulting from the administration or enforcement of the provisions of this chapter.

(2) Any miner or a representative of miners who believes that he has been discharged or otherwise discriminated against by any person in violation of paragraph (1) of this subsection may, within thirty days after such

the grounds of the Board's decision, we affirm its ultimate conclusions that Munsey voluntarily resigned his job as a coal miner on April 15, 1971, and that he was not illegally denied rehire later that day. We reverse the Board's conclusion that Munsey was not discriminated against when his coal company refused to rehire him on April 29, 1971. Finally, we remand this case [2] for consideration of successorship, liability, and related issues.

## I

### A. The Events of April 15 and April 29, 1971

On April 15, 1971, Glenn Munsey, Ernest Scott, and his son Arnold Scott, all members of the United Mine Workers of America, were working as part of a crew operating a continuous mining machine in the No. 1 mine of the Smitty Baker Coal Company, Inc.[3] As they were working, a five-ton rock

violation occurs, apply to the Secretary for a review of such alleged discharge or discrimination. A copy of the application shall be sent to such person who shall be the respondent. Upon receipt of such application, the Secretary shall cause such investigation to be made as he deems appropriate. Such investigation shall provide an opportunity for a public hearing at the request of any party to enable the parties to present information relating to such violation. The parties shall be given written notice of the time and place of the hearing at least five days prior to the hearing. Any such hearing shall be of record and shall be subject to section 554 of title 5. Upon receiving the report of such investigation, the Secretary shall make findings of fact. If he finds that such violation did occur, he shall issue a decision, incorporating an order therein, requiring the person committing such violation to take such affirmative action to abate the violation as the Secretary deems appropriate, including, but not limited to, the rehiring or reinstatement of the miner or representative of miners to his former position with back pay. If he finds that there was no such violation, he shall issue an order denying the application. Such order shall incorporate the Secretary's findings therein. Any order issued by the Secretary under this paragraph shall be subject to judicial review in accordance with section 816 of this title. Violations by any person of paragraph (1) of this subsection shall be subject to the provisions of sections 818 and 819(a) of this title.

(3) Whenever an order is issued under this subsection, at the request of the applicant, a sum equal to the aggregate amount of all costs and expenses (including the attorney's fees) as determined by the Secretary to have been reasonably incurred by the applicant for, or in connection with the institution and prosecution of such proceedings, shall be assessed against the person committing such violation.

The section has been amended. *See* 30 U.S.C.A. § 815(c) (1978).

**2.** The Federal Mine Safety and Health Amendments Act of 1977, 30 U.S.C.A. §§ 801–961 (1978), transferred responsibility for the review

of reprisal complaints from the Department of the Interior to the Secretary of Labor and the newly created Federal Mine Safety and Health Review Commission. *See* 30 U.S.C.A. § 815(c)(2) & (3) (1978); 30 U.S.C.A. § 823 (1978); 30 U.S.C.A. § 961 (1978). 30 U.S.C.A. § 815(c)(2) & (3) specifically lodges adjudicative responsibility with the Commission. Thus, although we review this appeal under the legal standards established by the Federal Coal Mine Health and Safety Act of 1969, *see* 30 U.S.C.A. § 961(c)(4) (1978), the Federal Mine Safety and Health Review Commission has been substituted as a party respondent in place of Cecil D. Andrus, Secretary of the Interior, Order of April 12, 1978, and this case will be remanded to the Commission.

**3.** Munsey was working as a jacksetter. As this court has explained before:

The company's mining operations followed the height of a coal seam about 40 to 42 inches thick, affording a maximum mine roof level of approximately 42 inches. In each of its two sections was a foreman and a normal crew of seven men, whose functions were coordinated with those of the drilling machine. A jacksetter and two timbermen worked on each side of the machine, and the seventh crewman operated the machine.

Jacksetters and timbermen must work on their hands and knees, and are equipped with knee and elbow pads for that purpose. Each jacksetter sets a jack on his side of the machine, and the jacks are then raised until they are pressed securely against the roof and the floor. Ropes are extended from the two jacks to the machine, which pulls along the ropes as it works laterally across the face of the coal seam. As the machine moves from left to right, the two timbermen on the left side install timbers between the floor and the roof while the timbermen on the right "knock down" their timbers ahead of the lateral motion of the machine. As the machine moves from right to left the process is reversed, the right timbermen installing timbers and the left timbermen knocking down their timbers. When the machine completes a cut into the working face, jacksetters take down their jacks and reset them in an advanced position on a line approximating the butt end of the

fell from the mine roof, struck the continuous miner, and grazed Munsey's arm. Work halted immediately. After the rock was removed, the roof was examined and pronounced safe by Fred Coeburn, a mine foreman, Earl Stapleton, a member of the United Mine Worker's local safety committee, and Clement Kempton, another foreman.

Almost immediately after work resumed, the operator of the continuous miner observed "dribbling," that is dust falling from the roof of the mineshaft. Fearful that the "dribbling" indicated that the roof was unsafe, he halted work. Again, Fred Coeburn inspected the roof and pronounced it safe. When Coeburn ordered Munsey and the Scotts to resume work, they refused; and Munsey said he believed the roof was unsafe. After other men offered to replace Munsey and the Scotts on the continuous miner crew, Clement Kempton offered to allow the men the opportunity to work in another area of the mine. The men refused these alternative duties, and Coeburn told them to leave the mine.

At the surface, Munsey and the Scotts met with Frank Cochran, the mine superintendent. Cochran said that the roof was safe, but told the men they could resume work in another part of the mine. The

three declined Cochran's offer and asked if they could leave work and return the next day. Cochran said that would be unfair to other miners. The men then left the mine area.

Soon after, Munsey informed Edward Gilbert, the union's local safety coordinator, of the incident. That afternoon, Gilbert and the three men met with Ralph Baker, manager of the coal company. Baker repeated Cochran's statement that it would be unfair to allow the men to return to the mine the next day. Gilbert said that Baker was violating section 110(b) of the Act, but Baker denied that he was unlawfully discriminating against Munsey and the Scotts.

Still later, Gilbert reported the events of the day to the Bureau of Mines, and relayed two safety complaints from Munsey: (a) that the roof was unsafe, and (b) that ventilation was inadequate in the mine. The next day a federal coal mine inspector visited the mine and found that the roof was safe, but that the mine was inadequately ventilated. He issued an order pursuant to section 104(c)(1) of the Act,[4] which shut down the mine for three days.

On April 29, Gilbert, the three men, Baker, the Mine Safety Committee, and the Labor Commissioner of the Harlan County Coal Operators' Association met. The coal

machine augers. Between jacksetting and resetting, jacksetters shovel loose coal and coal dust against the working face to enable the machine to scoop it up as it makes its passes. While jacksetters work up to the working face, timbermen work somewhat behind jacksetters but still near the working face, in an area which is unprotected by permanent timbers.
*Munsey v. Morton (Munsey I)*, 165 U.S.App. D.C. 379, 380, 507 F.2d 1202, 1203–04 n.6 (1974).
4. Section 104(c)(1), 30 U.S.C. § 814(c)(1) (1976), provides:
 If, upon any inspection of a coal mine, an authorized representative of the Secretary finds that there has been a violation of any mandatory health or safety standard, and if he also finds that, while the conditions created by such violation do not cause imminent danger, such violation is of such nature as could significantly and substantially contribute to the cause and effect of a mine safety or health hazard, and if he finds such violation

to be caused by a [sic] unwarrantable failure of such operator to comply with such mandatory health or safety standards, he shall include such finding in any notice given to the operator under this chapter. If, during the same inspection or any subsequent inspection of such mine within ninety days after the issuance of such notice, an authorized representative of the Secretary finds another violation of any mandatory health or safety standard and finds such violation to be also caused by an unwarrantable failure of such operator to so comply, he shall forthwith issue an order requiring the operator to cause all persons in the area affected by such violation, except those persons referred to in subsection (d) of this section, to be withdrawn from, and to be prohibited from entering, such area until an authorized representative of the Secretary determines that such violation has been abated.
This section has been amended. *See* 30 U.S. C.A. § 814(d)(1) (1978).

company refused Gilbert's offer to waive any rights to back pay if the company would rehire the men.

## B. *The* Munsey I *Litigation*

Prior to the April 29 meeting, the three men sought review of the coal company's action from the Department of the Interior. In an application for review of discharge, the men alleged that the company had violated section 110(b) by firing them for making safety complaints. Joint Appendix (J.A.) I at 12–13. An administrative law judge ruled in favor of Munsey and the Scotts, finding that (1) the company knew, or had reason to know, of the safety complaints made on April 15 and earlier complaints made to Gilbert, (2) the company discharged the men when foreman Coeburn ordered them to leave the mine and again when superintendent Cochran refused to reinstate them, and (3) the company's actions violated section 110(b)(1). *See Munsey v. Morton (Munsey I)*, 165 U.S.App.D.C. 379, 382–83, 507 F.2d 1202, 1205–06 (1974).

On appeal, the Interior Department's Board of Mine Operations Appeals reversed the administrative law judge's decision. The Board outlined three components of a successful section 110 allegation: (1) the miner must have reported an alleged violation to the Secretary of Interior or his authorized representative, (2) the miner must have been discharged after filing the report, and (3) the filing of the report must have caused the discharge. On the facts before it, the Board concluded that the men had been fired because they refused to return to work, and that Munsey's report to Gilbert was immaterial because it followed the discharge. *Id.* 165 U.S.App.D.C. at 383–84, 507 F.2d at 1206–07.

In *Munsey I* this court reviewed the Board's decision, and focused on two issues: (1) whether Munsey's report of a safety violation to his foreman and superintendent could be considered notification to the Secretary of the Interior within the meaning of section 110(b)(1), and (2) whether refusals to rehire could constitute illegal discrimination under that section.

This court concluded that the first issue had to be reconsidered in light of a decision that had been handed down after the Board's decision. In *Phillips v. Interior Board of Mine Operations Appeals*, 163 U.S. App.D.C. 104, 500 F.2d 772 (1974), this court held that a miner who had made a safety complaint to his foreman in accordance with the mine's procedures for reporting safety complaints had notified the Secretary within the meaning of section 110(b)(1)(A) and had instituted a proceeding within the meaning of section 110(b)(1)(B). The court found that the mine procedures "bridge[d] the gap" between the coal miner and federal authorities and, therefore, Phillips's report of a violation to his foreman, the closest representative of any authority on hand, was a report within the meaning of section 110(b). *Id.* 163 U.S.App.D.C. at 111–13, 500 F.2d at 779–81. In remanding the case, the *Munsey I* court instructed the Board to consider the applicability of *Phillips* and to make findings concerning the procedures for reporting safety violations in use at the Smitty Baker mine as of April 15, 1971. 165 U.S.App.D.C. at 386, 507 F.2d at 1209.

Additionally, the *Munsey I* court remanded for the Board to consider whether Baker's refusal to rehire the men was in retaliation for the petitioners' report via Gilbert to the Bureau of Mines. If so, the court held that "a refusal to reemploy a miner because he has seen fit to complain to an authorized representative of the Secretary about working conditions in the employer's mine" would be illegal under section 110(b)(1). *Id.* 165 U.S.App.D.C. at 387, 507 F.2d at 1210.

## C. *The Present Proceedings*

On remand, the Board instructed a second administrative law judge (ALJ) to make the findings necessitated by *Munsey I*, and any other findings he might think appropriate. J.A. II at 809–10. The Board also granted petitioners' motion to add as respondents to the proceedings the P&P Coal Company, which the petitioners alleged was the successor to the now defunct Smitty Baker Coal Company, Inc., Ralph Baker, and Smit-

ty Baker, the owner of the Smitty Baker Coal Company, Inc., without prejudice to their opportunity to defend any issue on the merits. *Id.* at 805–06. Prior to the second hearing, the Scotts withdrew their application for review. *Id.* at 812.

The ALJ concluded that the initial discharge and the first refusal to rehire on April 15 did not violate the Act, but that the refusal to rehire on April 29 did. Regarding the initial discharge, the ALJ concluded that: (1) the mine had "no well-defined procedures to implement the Act," J.A. III at 1336, and, therefore, Munsey's complaint to his foreman could not be considered notification pursuant to section 110(b)(1), and (2) Munsey voluntarily left his job when he refused to work in either the rockfall area or in any other portion of the mine. *Id.* at 1344–45.[5]

Concerning the refusal to rehire on April 15, the ALJ found that, although a valid report had been made to Gilbert, the company's actions were taken for legitimate reasons: Ralph Baker acted because he believed Munsey unreasonably refused to continue working in the mine and because he was not completely informed of the day's events. *Id.* at 1346–47.

The ALJ found that Baker did act with discriminatory intent when he refused to rehire Munsey on April 29, 1971. Given the two-week period between the events of the fifteenth and the twenty-ninth, the ALJ discounted Baker's explanation that he had not had time to consider the matter. *Id.* at 1349. The lack of valid justification, combined with Baker's refusal to rehire Munsey after the miner offered to waive any right to back pay, led the ALJ to infer a motive of retaliation for the refusal to rehire. *Id.* at 1350.

On review, the Board accepted the ALJ's findings and conclusions, but offered an additional reason for its decision that no

violation occurred on April 15. *Munsey v. Smitty Baker Coal Co.*, 84 Interior Dec. 336, 338–39 (1977). The Board held that "a miner who abuses the protection of [section] 110(b) by initiating bad faith and frivolous complaints to the Secretary or his authorized representative was never intended by Congress to be covered by that section." *Id.* at 339. The Board found that Munsey's complaint was in bad faith and frivolous because it came after the roof had been repeatedly examined and found safe, and because Munsey refused to accept alternative work. *Id.* at 340–41. Having determined that Munsey did not make a valid report under section 110(b), the Board summarily reversed the ALJ's conclusion that the coal company had retaliated against Munsey on April 29. *Id.* at 341. This petition for review followed the Board's decision.[6]

■ Before we consider the merits of Munsey's petition, we stop briefly at a procedural way station. The petitioner charges that the Board was without authority to order a new evidentiary hearing after the *Munsey I* court remanded the case to the Board for consideration, *inter alia*, of the effect of this court's *Phillips* decision. Brief for Petitioner at 45. Munsey believes that the Board did not have the authority to consider any issues that were not explicitly enumerated in the court's decision remanding the case. Although there is authority to suggest that the Board's actions would be entirely proper in any circumstances, *see Fly v. Heitmeyer*, 309 U.S. 146, 60 S.Ct. 443, 84 L.Ed. 664 (1940); *FCC v. Pottsville Broadcasting Co.*, 309 U.S. 134, 139–46, 60 S.Ct. 437, 84 L.Ed. 656 (1940), we believe that the petitioner's own actions in this case forestall his present objection. On remand, the petitioner sought to add three additional respondents, the P&P Coal Company, Ralph Baker and Smitty Baker. The Board

---

**5.** The administrative law judge also held that Munsey was not protected by section 110 because he had not intended to make a safety complaint to federal officials. *See Munsey v. Smitty Baker Coal Co.*, 84 Interior Dec. 336, 338 (1977). We reject this rationale for the reasons stated in *Baker v. Department of Inte-*

*rior,* 193 U.S.App.D.C. —— at ——–——, 595 F.2d 746 at 748–750 (1978).

**6.** Intervenors in this petition for review are the Smitty Baker Coal Co., Inc., Ralph Baker and Smitty Baker.

granted the motions "without prejudice to the presentation of any defenses by such respondents on the merits." J.A. II at 808. We believe that the petitioner's acquiescence in this order and his subsequent participation, without objection, in the second evidentiary hearing forecloses attack on the Board's decision. *See International Paper Co. v. FPC*, 438 F.2d 1349, 1357–58 (2d Cir.), *cert. denied*, 404 U.S. 827, 92 S.Ct. 61, 30 L.Ed.2d 56 (1971); *SEC v. R. A. Holman & Co.*, 116 U.S.App.D.C. 279, 282, 323 F.2d 284, 287, *cert. denied*, 375 U.S. 943, 84 S.Ct. 350, 11 L.Ed.2d 274 (1963).

## II

Three reasons have been advanced to justify Munsey's termination of employment on April 15. The Board adopted the ALJ's conclusions that Munsey had not notified the Secretary and that he voluntarily left his job. The Board added another ground: Munsey's failure to file a report that was in good faith and not frivolous. We find that Munsey did file a report within the meaning of section 110(b)(1), and that the Board erred in imposing a good faith and not frivolous test for section 110(b) reports. We affirm the Board's decision, however, on the ground that Munsey voluntarily resigned his position on April 15.

### A. *Notification*

The *Phillips* court placed great emphasis on a miner's use of the established procedures for reporting safety complaints. 163 U.S.App.D.C. at 110, 500 F.2d at 778. The court stated that the "existence of this procedure in itself was a practical recognition that the bare words of the Safety Act, unless implemented by some procedure at the mine to bridge the gap between 'the Secretary or his representative' (presumably the Federal Bureau of Mines) and the coal miner himself (the object of the Act), would be completely ineffective in achieving mine safety." *Id.* 163 U.S.App.D.C. at 111, 500 F.2d at 779. The court described the procedure at the mine which, briefly stated, gave a miner the right to report a suspected safety violation first to his fore-

man with appeal rights to a Mine Safety Committeeman, then to either the full Mine Safety Committee or directly to a federal mine inspector, *id.* 163 U.S.App.D.C. at 111–12, 500 F.2d at 79–80. Having found that Phillips followed the procedure by notifying his foreman of the safety violation, the court concluded that the miner had invoked the protections of the Federal Coal Mine Health and Safety Act. *Id.* 163 U.S.App. D.C. at 112–13, 500 F.2d at 780–81.

In the present case, the ALJ found that no contractual safety reporting procedures existed at the mine, but did find that procedures had been established by "custom and usage." J.A. III at 1335. The miner's first step was to contact his foreman or another member of the mine management. If he remained unsatisfied, the miner could report the alleged violation to the mine safety committee, and through the committee, to the union safety coordinator and federal officials; or, alternatively, the miner could proceed directly to the union safety coordinator. *Id.* Munsey followed this procedure by complaining first to his foreman Coeburn, then to the mine superintendent Cochran, and after his complaints were rejected, to Gilbert, the union safety coordinator who, in turn, contacted the Bureau of Mines.

In spite of these findings, the ALJ concluded that there were "no well defined procedures to implement the Act." *Id.* at 1336–37. The ALJ's conclusion simply cannot be harmonized with his finding that defined procedures had been established by custom and usage at the mine, and that Munsey had followed these procedures. Because Munsey's complaint to the mine foreman and superintendent on the morning of April 15 was made in accordance with established procedure, we believe that *Phillips* mandates the conclusion that the miner has successfully bridged the gap between himself and federal officials. Thus, we find that Munsey's complaint to his foreman and mine superintendent was a notification of the Secretary and the institution of proceedings within the meaning of section 110(b).

## B. *Good Faith and Not Frivolous Requirement*

■ The Board of Mine Operations Appeals relied upon the ALJ's findings of fact to create an additional ground for upholding the ALJ's finding of no violation on April 15. The Board held "that a miner who abuses the protection of [section] 110(b) by initiating bad faith and frivolous complaints to the Secretary or his authorized representative was never intended by Congress to be covered by that section." 84 Interior Dec. at 339. Accepting the ALJ's findings that Munsey's complaint was not in good faith and was frivolous, the Board concluded that Munsey had failed "to meet his prima facie burden consistent with the requirement of section 110(b)" and thus had no cognizable claim for relief. *Id.* at 341. The Board's imposition of the good faith and not frivolous requirement is based on its reading of congressional intent and the *Phillips* and *Munsey I* opinions. We are unable to find, however, any support in any of those sources for the Board's new requirement.

Although the Board claims to be implementing congressional intent, it points to no statutory language or legislative history that would bolster its position. The actual statutory language fails to suggest that notification is to be judged on any good faith or not frivolous standard. The statutory history consists chiefly of the remarks made by Senator Edward M. Kennedy when he introduced the amendment that was to become section 110(b). Senator Kennedy emphasized the need to encourage the reporting of suspected safety violations:

> Mr. President, the rationale for this amendment is clear. For safety's sake, we want to encourage the reporting of suspected violations of health and safety regulations. Section [103(g) of the Act] confirms this concern by calling for immediate inspection whenever a representative of miners believes that there may be a violation of health or safety standards.

But miners will not speak up if they fear retaliation. This amendment should deter such retaliation, and, therefore, encourage miners to bring dangers and suspected violations to public attention.

115 Cong.Rec. 27948 (1969). We believe that Senator Kennedy's desire to "encourage" safety violation reports strongly suggests that Congress would not want to place additional procedural and substantive burdens on miners who seek the protection of section 110(b) by requiring that the miners demonstrate their state of mind and the merit of their complaints. *See Baker v. Department of Interior*, 193 U.S.App.D.C. — at —, 595 F.2d 746 at 749–750 (1978) (requiring specific intent to notify federal authorities would place a burden on miners inconsistent with the purpose of section 110(b)).

In addition, Senator Kennedy stated that the new section would give coal miners the same protection from reprisal that workers already had under other legislation. 115 Cong.Rec. 27948 (1969). Specifically, he referred to section 8(a)(4) of the National Labor Relations Act, 29 U.S.C. § 158(a)(4) (1976).[7] When section 8(a)(4) was debated on the floor of the Senate, the bill's sponsor, Senator Wagner, was asked how the section would be applied in a situation much like the one the Board found in this proceeding:

> MR. HASTINGS. Now let me inquire about paragraph (4), on page 11, which says that it shall be an unfair labor practice for an employer—
>
> *To discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this act.*
>
> Suppose an employee should file a perfectly outrageous charge, one which was not true, and which he knew was not true: Under paragraph (4) is it the Senator's notion that the employer might, because of that, and even if that fact were shown, be found guilty of an unfair labor practice?

---

7. 29 U.S.C. § 158(a)(4) (1976) states: "It shall be an unfair labor practice for an employer . . . to discharge or otherwise discriminate against an employee because he has filed charges or given testimony under this subchapter."

MR. WAGNER. Merely because he has filed charges related to unfair labor practices no employee should be discriminated against. That is exactly what that section means; otherwise, even though there might be flagrant violations of the provisions of this measure, an employee would not be free to file charges. He would know that the moment the charges were filed he would be discharged.

. . . . .

MR. HASTINGS. The trouble here is the same trouble we frequently have. In trying to correct one evil, we create a new one. I agree with all that. I agree that the worker ought to have a right to make complaint about the violation of this proposed law, and that he ought not to be discriminated against for so doing; but I had in mind whether we could not put in the measure a provision that a person who did so in good faith should not be discriminated against, and not leave the provision as broad as it is, so that an employee might file charges maliciously, for instance, knowing that he could not lose his job even if he did so maliciously.

MR. WAGNER. The suggestion of the Senator would bring up another question that would complicate the situation still more. I do not think the provision as it now stands will be subject to any abuse.

MR. HASTINGS. The Senator from New York is in charge of the bill.

MR. WAGNER. I am satisfied with the provision as it stands.

79 Cong.Rec. 7676 (1935) (emphasis in original). Following Senator Wagner's interpretation of the section, the NLRB has held that section 8(a)(4) provides protection even for an employee who files meritless charges. *Bayport Fabrication, Inc.*, 185 N.L.R.B. 516, 517 (1970); *American International Aluminum Corp.*, 149 N.L.R.B. 1205, 1210 (1964).

The Board also relies on language in *Phillips* and *Munsey I*, which indicates that a

good faith refusal to work under allegedly unsafe conditions may be protected by section 110(b), to support the imposition of its good faith and not frivolous test. 84 Interior Dec. at 339. We think that the language of those cases is inapposite. The *Phillips* court noted that the miner had a contractual right to refuse to work under conditions which he believed in good faith to be hazardous. The existence of the contractual right was evidence tending to support the court's ultimate conclusion that Phillips had been fired, not because he refused to work, but because he had complained about safety conditions. 163 U.S.App.D.C. at 112, 500 F.2d at 780.[8] In *Munsey I*, the court's suggestion that a miner "may have the right to refuse to work under conditions believed in good faith to be dangerous" was contained in a footnote as part of its directions to the Board on remand. 165 U.S. App.D.C. at 386 n.58, 507 F.2d at 1209 n.58. The dictum of *Munsey I*, which suggests that there may be a right to refuse to work, does not support the Board's imposition of a good faith and not frivolous test within the notification provisions of section 110(b).

In sum, the Board has been unable to point to any indication of congressional intent that would support the imposition of a good faith and not frivolous test as a portion of section 110(b). We believe that Senator Kennedy's remarks reflect a desire to encourage reporting—a desire that could be frustrated by the imposition of an additional requirement on a miner who seeks federal protection against retaliatory employer action. We also find support in the legislative history and adjudicative interpretation of a closely analogous statute. Thus, we must reverse the Board's holding that Munsey was not discharged in violation of section 110(b) because he filed a report that was frivolous and not in good faith.

## C. *Voluntary Resignation*

 The Federal Coal Mine Health and Safety Act does not protect a miner from

---

8. Although the *Phillips* court also mentioned frivolousness in passing, *see Phillips v. Interior Bd. of Mine Operations Appeals*, 163 U.S.App. D.C. 104, 110, 500 F.2d 772, 778 (1974), the court's determination that the Act applied did not focus on the merit of Phillips's complaint. *See id.* 163 U.S.App.D.C. at 111–13, 500 F.2d at 779–81.

the consequences of voluntarily resigning a job. Because we uphold the ALJ's finding that Munsey voluntarily quit his job on the morning of April 15 for reasons unrelated to his report of safety violations, we affirm the Board's conclusion that on the morning of April 15 there was no violation of section 110(b) by the coal company.

The ALJ found that both Munsey's foreman Kempton and the mine superintendent Cochran offered Munsey the opportunity to work in areas of the mine away from the rockfall, but that Munsey voluntarily left the minesite. Munsey's refusals of these offers form the essential basis for the ALJ's finding that Munsey resigned for reasons unrelated to a belief that the roof was unsafe. J.A. III at 1342–43.

Petitioners attack the finding that Munsey was offered employment away from the rockfall. We find, however, in accord with the statutory review provision of the Federal Coal Mine Health and Safety Act,[9] that the finding is supported by substantial evidence. Both Clement Kempton and Fred Coeburn testified that Kempton offered Munsey the opportunity to work in an area 100–400 feet from the rockfall before Munsey left the mine. See J.A. III at 1191–94, 1197 (Kempton); id. at 1215–16 (Coeburn). In addition, Frank Cochran testified that he offered Munsey the chance to work in other areas of the mine away from the rockfall, see id. at 1139–41, 1156–57, but that Munsey refused to re-enter the mine, J.A. I at 458. Furthermore, another miner testified that he heard Cochran offer Munsey alternative work, and heard Munsey refuse it. See J.A. III at 1125–35. Although petitioner attacks the veracity and motivation of these witnesses, he does not direct us to any evidence that would contradict their testimony or the ALJ's resulting finding.

Because we uphold the finding that Munsey voluntarily quit his job, as evidenced by his refusal to work in any part of the mine, we need not address the issue whether he had a good faith belief that the rockfall area was unsafe.[10]

### III

■ The Board also upheld the ALJ's determination that Ralph Baker's refusal to rehire Munsey on the afternoon of April 15 was not a violation of section 110(b). The ALJ found that Munsey had made a report within the meaning of section 110(b) prior to the afternoon meeting. Nevertheless, the ALJ found that Baker's refusal to rehire was taken for nondiscriminatory reasons. First, the ALJ found that Ralph Baker acted to discourage miners from voluntarily leaving their jobs with the expectation they would automatically be rehired. Second, Baker did not have full knowledge of the facts surrounding the rockfall incident. J.A. III at 1346–47. Finally, the ALJ concluded that "[t]here is no direct evidence in the record indicating that [Munsey's] reports were the precipitating cause of Baker's decision not to rehire him." Id. at 1348.

Finding that the ALJ's conclusion concerning the refusal to rehire on April 15 is supported by substantial evidence on the record, we affirm.

### IV

The Board reversed the ALJ's finding that section 110(b) had been violated by Baker's discriminatory refusal to rehire on April 29. The Board's reason for reversing

---

9. Section 106(b) of the Federal Coal Mine Health and Safety Act of 1969, 30 U.S.C. § 816(b) (1976), provides that the reviewing court "shall hear such petition [for review] on the record made before the Secretary or the Panel. The findings of the Secretary or the Panel, if supported by substantial evidence on the record considered as a whole, shall be conclusive." This section has been amended. See 30 U.S.C.A. § 816(a) (1978).

10. Petitioner argues that this issue was settled by a statement in *Munsey I* that "[t]he evidence is clear that petitioners feared another rock fall from the roof . . . ." 165 U.S.App.D.C. at 386, 507 F.2d at 1209. Whether Munsey did actually fear for his safety in the rock fall area is irrelevant, however, because his voluntary resignation is proved by his refusal to work in any other area of the mine, and does not depend on his refusal to continue work in the rockfall area.

the ALJ's judgment was based on its use of the good faith and not frivolous test rejected in Part II B *supra.* Finding that Munsey had never filed a good faith report under section 110(b), the Board stated that "the statute was [not] intended to allow a miner who acted in bad faith to demand relief from an adverse reaction by an operator against an unprotected activity based on later, purely coincidental events." 84 Interior Dec. at 341. We understand this sentence to mean that the Board believes the closing of the mine on April 16 was due to ventilation violations unrelated to Munsey's report to his local union safety coordinator, Gilbert.

We cannot uphold the Board's decision, first, because it is based on the erroneous imposition of a good faith and not frivolous requirement into the notification provision of section 110(b), and, second, because the Board ignored the fact that Munsey's complaint to Gilbert referred to inadequate ventilation in the mine as well as the roof problem.[11] The ALJ found that the motivation for the refusal to rehire on April 29 was retaliatory for the report to Gilbert which led to the mine's closing on April 16. J.A. III at 1330–31, 1350. In its review of the ALJ's decision, the Board did not mention the ventilation complaint. Thus, even if the Board could impose a good faith and not frivolous test to discredit the report of roof safety, it has failed to explain why the ventilation report made on the afternoon of April 15 was not valid, or explain why this report was not an adequate basis for the ALJ's decision that the April 29 refusal to rehire was retaliatory. We believe that Munsey's reports on April 15 of both the allegedly unsafe roof and the problem of inadequate ventilation entitled him to the protection of the Act.

■ The ALJ found that the refusal to rehire on April 29, 1971, was discrimination within the meaning of the Act. J.A. III at 1349–50, *see Munsey I,* 165 U.S.App.D.C. at 388, 507 F.2d at 1211. The ALJ rejected Ralph Baker's explanation that he did not rehire Munsey on the twenty-ninth because he had not had time to consider Munsey's request. Given the two week time period since the original events, and the existence of an earlier case in which the coal company had rehired an employee three days after discharge, the ALJ concluded that Baker's rationale was pretextual. *Id.* at 1349–50. Noting that Munsey had offered to waive back pay, the ALJ could discover no valid reason for the refusal to rehire, and concluded "on the basis of the total circumstances proved that a motive of retaliation for applicant's complaints to the Secretary may be inferred from the circumstances surrounding the failure to rehire applicant on April 29, 1971." *Id.* at 1350. We believe, therefore, that the ALJ's conclusion that the motive for Baker's refusal to rehire on April 29 was retaliatory is supported by substantial evidence. Because the Board accepted the ALJ's findings of fact, but rejected his conclusion solely on the basis of its good faith and not frivolous test, we order that the ALJ's decision on this issue be reinstated.

### V

At oral argument, the petitioner's counsel conceded that several issues that were not considered by the Board should be remanded for initial consideration. Accordingly, we remand for consideration the issues whether Ralph Baker can be ordered to rehire Munsey at Baker's new mining operation, Mason Coal Company, *see* Brief for Petitioner at 54, whether P&P Coal Company is a successor to the Smitty Baker Coal Company, Inc., which may be ordered to reinstate Munsey, *see id.* at 54–57, and whether the P&P Coal Company, even if it is not a successor to Smitty Baker Coal Company, Inc., may be liable under section 110 for refusing to hire Munsey, *see id.* at 57.

Thus, the Board's order is affirmed in part, reversed in part, and remanded for consideration of the aforementioned issues.

*So ordered.*

---

11. *See* text *supra* at —— of 193 U.S.App.D.C., at 738 of 595 F.2d.